**SLEZAK et al. v. ANDREWS et al.**

**SAME v. INTERNATIONAL TICKET SCALE CORPORATION.**

**Nos. 1010, 1181**

District Court, D. Delaware.

Dec. 30, 1937.

See, also, 16 F.Supp. 564.

William G. Mahaffy and Herbert L. Cohen, both of Wilmington, Del., and John D. Morgan and George B. Finnegan, Jr. (of Morgan, Finnegan & Durham), both of New York City, for plaintiffs.

E. Ennalls Berl (of Ward & Gray), of Wilmington, Del., and George L. Schein, and Isaac Levinson, both of New York City, for defendants Archie M. Andrews and International Ticket Scale Corporation.

Hugh M. Morris and Alexander Nichols, both of Wilmington, Del., and George L. Schein, of New York City, for defendant Dictograph Products Co., Inc.

NIELDS, District Judge.

The first of these equity suits seeks an accounting of royalties under a certain license agreement and injunctive relief. As a counterclaim to royalties due, International seeks to offset sums spent by it in defense of two infringement suits.

The second seeks to rescind the license agreement.

Plaintiffs Vincent F. Slezak and the American Ticket Scale Company are citizens of Illinois. Defendants International Ticket Scale Corporation and Dictograph Products Company, Inc., are corporations of Delaware. Archie M. Andrews is a resident of Connecticut. He was not served with process and has not voluntarily appeared.

License Agreement.

Slezak was a native of Czecho-Slovakia. He said of himself: "I am a scale man for many years. My father had a scale shop in Czecho-Slovakia." In 1925 he came to Chicago and was employed as a mechanic by Rhodes-Hochreim Manufacturing Company, a subsidiary of Peerless Weighing Machine Company. After a few months, Slezak quit this employment and set up a shop of his own in Chicago. In August, 1925, he started to develop his ticket scale and afterwards applied for various patents thereon.

Andrews was president, director, and the largest stockholder of Peerless. In 1926 and 1927 the only large company dealing in ticket scales was Consolidated Automatic Merchandising Corporation, referred to as "Camco." Its subsidiaries were Peerless and Rhodes-Hochreim. Andrews ceased to be president of Peerless in the spring of 1928, but continued its largest stockholder. He and his family owned more than 90 per cent. of the capital stock of International and more than 50 per cent. of the

capital stock of Dictograph, a machine manufacturing company of long standing. In 1928 Dictograph was manufacturing ticket scale parts for Peerless.

Andrews was informed by an employee of Peerless that Slezak's scale was an improvement on the scale then being sold by Peerless. In December, 1927, Andrews and others visited Slezak's shop in Chicago and inspected his scale. Slezak describes the interview at his shop:

"Q. When did you first meet Mr. Archie M. Andrews, who is one of the defendants in this suit? A. Mr. Archie M. Andrews, the week before Christmas in December, 1927, it was in the Holy Days.

"Q. How did you meet him, under what circumstances? A. He called me at my home in Chicago.

"Q. Will you relate what happened? A. He said, 'I heard that you have a new ticket scale'. I say 'Yes'. He said, 'Could I see it?' I say 'Yes'. 'Where that machine is'. I told him the address of my shop and he told me that he will be there in one hour with several officers of the Camco concern.

"Q. Was Mr. Andrews at that time an officer of the Peerless Company? A. Yes, I believe the President.

"Q. And is the Peerless Company one of the organizations under the holding company, Camco? A. Yes. * * *

"Q. And is the Rhodes-Hochreim Company also a member of the Camco organization? A. Yes. They came to my shop.

"The Court: Who?

"The Witness: Mr. Andrews and four other officials of their organization, two of them I did know from Chicago and they were from the Rhodes-Hochreim Manufacturing concern, the president and the chief engineer of that concern. The two other I did not know. They were from a New York concern. * * *

"Q. Did you demonstrate your ticket scale machine to Mr. Andrews at that time? A. Yes, fully.".

In the succeeding months Andrews resigned as president of Peerless and decided to obtain for himself an option to purchase the Slezak patents and a license to manufacture thereunder. In June, 1928, Andrews telegraphed Slezak "Come to New York with your lawyer and a scale." Thereupon Slezak shipped his scale and

proceeded to New York with Richard J. Flannigan, the secretary of the American Ticket Scale Company, assignee of the Slezak patents. Flannigan was a young lawyer having no experience with patents or patent licenses. When the first New York conference occurred between Andrews and Slezak, there were several Peerless scales in Andrews' office. Slezak knew that Dictograph was manufacturing parts for Peerless and assumed that under any option or license agreement granted to Andrews the Slezak patents would be exploited by Peerless and its large organization. At a later conference Andrews called in Koch, managing engineer for Dictograph, to estimate the cost of manufacturing the Slezak scale. Slezak wanted a royalty of $15 per scale and $25,000 to cover his expenses during the experimental period. Andrews represented that he would make at least 100,000 scales and distribute them widespread like cash registers. On these representations Slezak finally agreed to a royalty of $5 per scale and $33,000 to cover expenses.

To confer with Andrews and his counsel, Slezak and Flannigan boarded Andrews' yacht lying in New York harbor. The main terms of the contract were reached after dinner. The contract was finally drafted by David L. Podell, a leading practitioner in New York. Neither party consulted a patent lawyer. This is apparent from the terminology of the contract. Slezak wanted to send for his patent attorney, Eugene G. Mason of Washington, D. C. Andrews insisted on rushing the contract through. Slezak was a skilled mechanic, but had no previous experience in drafting patent licenses.

June 16, 1928, a license agreement was formally executed by plaintiffs as licensors and Archie M. Andrews as licensee. By the license agreement Andrews was granted an option to purchase the Slezak patents and an exclusive assignable license under the Slezak patents and applications. Thereafter, Andrews formed defendant International Ticket Scale Corporation, and assigned the license agreement to it. On the day the license agreement was signed, Andrews employed Slezak under a separate written employment contract for three years. This was later extended for two years from June 16, 1931, with International as the employer.

The option in the license agreement to purchase the Slezak patents was never ex-

ercised and can be disregarded. Under the license agreement, International agreed (a) to pay licensors $33,000 in cash upon the execution of the agreement; (b) $5 as royalty upon each machine manufactured and sold by International; (c) a minimum royalty of $10,000 per year for machines sold in the United States for a period of five years from the date of the sale of the first machine; and (d) certain minimum royalties for a like period for machines sold in foreign countries. "Settlement of royalties shall be had and made quarter-annually."

The licensee paid to the licensors the $33,000 provided in the license agreement. Also the licensee paid to the licensors the minimum quarter-annual royalty payments of $2,500 due March and June, 1929. Thereafter no royalties have been paid, International claiming the right under paragraph 29 of the license agreement to offset various fees and expenses paid and obligations assumed by it against the royalties due to the licensors.

The controversy as to royalties turns on the interpretation of paragraph 29 of the license agreement which is set forth in footnote [1]. For convenience, this para-

[1] "29. [Section A] The Purchaser or his assigns shall at his or its or their own expense, commence and prosecute infringement suits against all who in their judgment are infringing any or all of the said patents issued or to be issued and out of all damages and other moneys collected over and above the reasonable and actual cost of prosecuting such suit or suits, the Inventor and/or the Company shall be paid 10% of such excess. The Inventor and/or the Company, if they or either of them are advised or learn of any infringement, may demand by a notice in writing that the Purchaser or his assignee shall institute proceedings to enjoin such infringement, but in the event the Purchaser or his assignees fail, neglect or refuse to institute such proceedings, the Inventor and/or the Company shall have the right of prosecuting such infringement suits at their own expense and in such case or cases, the Inventor and/or the Company shall keep and retain all the damages and other moneys collected in such suit or suits, provided, however, that if the Inventor and/or the Company are successful in obtaining and securing in such suit or suits an injunction compelling and restraining such infringer or infringers from manufacturing, selling or delivering or operating machines, and if they or either of them fail to recover sufficient damages in relation to such suit or suits and because of them to reimburse the Inventor and/or the Company for their reasonable and actual cost, expense and counsel or attorney's fees, then and in such event or events, the Purchaser or his assignee shall, within thirty (30) days after a notice containing a statement of such recoveries, damages, actual and reasonable costs, expenses and counsel or attorney's fees pay and reimburse the Inventor and/or the Company for such deficiency.

"[Section B] In the event any suit or suits are commenced or prosecuted against the Purchaser or his assignees, in which claim is made affecting the validity of the said patents, issued and to be issued, as well as all improvements, amendments, additions or modifications thereof and/or the right of the Purchaser or his assignees to manufacture, sell, vend or operate under this agreement and/or under the said patent or any or either of them, such suit or suits shall be defended at the expense of the Inventor and/or the Company and the Inventor and/or the Company shall retain counsel suitable to the Purchaser or his assignees and if the parties hereto are unable to agree upon counsel, they shall choose and supply their own respective counsel at their own respective expense but such provisions as to defense of such suit or suits shall only apply until there has been a final adjudication upholding the validity of such patent or patents; in such cases the Inventor and/or the Company shall have the full control of such litigation. After adjudication of any one of such case or cases, upholding the validity of said patents involved in such case or cases all expenses of all suits, actions and proceedings shall be sustained and borne by the Purchaser or his assignees and in the event that the Purchaser or his assignees shall recover damages in any such suit or suits or proceedings in excess of the actual reasonable cost and expense, including attorneys and counsel fees, 10% of such recoveries and collections shall be paid to the Inventor and/or the Company within thirty days after such collections.

"[Section C] In the event that the patent above described are finally held to be infringements of any other patent or patents, the Inventor and/or Company shall be liable to the Purchaser and his assignees for damages to the amount of

graph has been divided into three sections indicated as A, B, and C. Section A relates to infringement suits brought against others for infringement of the Slezak patents and provides that such suits shall be commenced and prosecuted by Andrews or his assignee "at his or its or their own expense." Clearly, all suits brought for infringement of the Slezak patents must be prosecuted and paid for by International. No such suit has been brought and section A may be disregarded.

Section B of paragraph 29 relates to the defense of suits "against the purchaser or his assignees," that is, suits charging infringement of patents owned by outside parties by the mechanism manufactured under the Slezak license. It provides for the allocation between licensors and licensee of the expenses and counsel fees incident to such suits.

Section C of paragraph 29 provides for the termination of the license agreement by the licensee in the event an infringement suit against International is sustained. Termination of the license agreement by the licensors for failure of the licenses to pay royalties is contained in paragraph 25 of the license agreement. This paragraph is set forth in full in footnote [2].

### Manufacture Under License.

In the fall of 1928 International contracted with Dictograph to manufacture Slezak ticket scales on a cost plus 25 per cent. basis. Dictograph made the tools required for this manufacturing job at a cost to International of $135,000. With these tools Dictograph manufactured approximately 6,000 scales for International at a cost of $125 each.

International sold or placed on location the 6,000 ticket scales and received therefrom, since 1929, an average annual income of $200,000 or a total of approximately $1,400,000. International has paid Dictograph about $1,000,000 for both tools and ticket scales. It liquidated its entire obligation to Dictograph by June, 1936.

### Infringement Suits.

In April, 1929, Rhodes-Hochreim brought an infringement suit in this court charging International with infringing Hochreim patent No. 1,598,620, Caille patent No. 1,622,571, and Smith patent No. 1,558,644 by the sale of ticket scales manufactured for International under the Slezak patents. Similar suits were brought in the

all royalties received plus all reasonable expense and cost, including reasonable and actual counsel or attorney's fees, necessarily incurred, in the defense of such suit or suits and thereupon this agreement shall ipso fact be terminated and annuled and the Purchaser and his assignees be released of all obligations whatsoever to the Inventor and/or the Company."

[2] "25. It is further agreed that in the event that there shall be any default on the part of the Purchaser or his assigns (a) either in the mailing of a statement to the Inventor and/or the Company of the machines manufactured, sold and delivered and the amount of royalties due thereon, for the preceding quarter, or (b) in the payment of such royalties on the due date thereof, then the Inventor and/or the Company may serve a thirty (30) days' notice and demand for a statement embracing the amount of machines manufactured, sold and delivered and the amount of royalties due thereon, such notice and demand to be addressed by registered mail to the Purchaser at ——— in the City of New York and State of New York, and/or to the assignee or assignees of the Purchaser (a copy of such notice and demand to be sent to the Purchaser in any event) then the Purchaser and his assignees shall have thirty (30) days' time from and after the date of the receipt of such notice and demand by registered mail within which to furnish such statement and to make payment of any such royalties due and unpaid and on failure of the Purchaser or his assignee to furnish such statement and make such payment within the time prescribed the Inventor and/or the Company may forthwith enter judgment for all royalties that may be found to be due and unpaid and in addition thereto shall have the right to apply for and secure an injunction restraining the manufacture, sale and delivery of any machines containing any of the patents herein described until such statement has been furnished and payment with interest from its due date has been duly and fully made.

"If there be no statement furnished and no payment made for a period of six months from the date of issuance and service of such injunction then the Inventor and/or the Company shall be at liberty to manufacture and exploit the patents on and for his own account or the account of the Company to the same extent as though the rights under this agreement had never been granted."

Southern District of New York against F. W. Woolworth Company and in the Northern District of Illinois against Goldblatt Bros. The Woolworth Company insisted that International furnish it with bonds in the sum of $400,000 to protect it against infringement suits as a condition of retaining the scales. These bonds were furnished by International at a cost of $5,500. International requested Slezak in writing to defend the infringement suits and to retain counsel therefor in accord-Fish, Richardson, and Neave to watch the litigation and to advise International of ance with his undertaking in the license agreement. This Slezak did.

However, before calling on Slezak to defend these suits, International retained its progress. During the progress of the suits, International also retained the following law firms: Ward, Crosby & Neal; Hammond & Littell; Watson, Bristol, Johnson & Leavenworth; Stone, Boyden, Mack & Hahn; and Wilcox, Swiger, Chambers & Scrandrett. These were all employed and paid by International. They were not employed by Slezak or for his account. Slezak did not authorize their employment nor promise directly or indirectly to pay them. No more did Slezak agree to pay the premiums on the infringement bonds which International furnished to protect Woolworth.

Slezak retained counsel to defend the infringement suits as he had agreed in the license agreement. Mr. Mason of Sturtevant, Mason & Porter of Washington, D. C., prepared and conducted the defense through the taking of testimony in the District Court. Slezak paid Mason his fees and expenses. Mason discovered and proved a prior use. This proof caused Rhodes-Hochreim to withdraw the Hochreim and Caille patents from the three infringement suits. Withdrawal of these patents without adjudication was at the request of International, to prevent throwing open the ticket scale art to other competitors. Slezak consented to this withdrawal without adjudication, on condition that his rights under the license agreement should not be prejudiced.

The Smith patent alone remained in the infringement suits. It covered only the scaling device of the scale. This device was not covered by the Slezak patents. It was not developed by Slezak, but was an unpatented design of Koch, managing engineer of Dictograph. However, Mason continued to defend against the Smith patent until the close of the evidence. Thereupon International took control of the suit, insisting that its counsel Clark & Landers prepare the brief and argument on final hearing.

July 30, 1930, this court held the Smith patent valid and infringed. After this adverse decree, International dismissed Clark & Landers and retained L. A. Watson to conduct the appeal. This was done without the knowledge of Slezak. Slezak paid Mason to represent the plaintiffs on the appeal. Mason assisted Watson in the preparation of the appeal brief and in the argument. He attended at the hearing on appeal. Watson followed the argument in Mason's brief. February 13, 1931, the Court of Appeals reversed this court and held the Smith patent not infringed.

Previously, on January 7, 1931, Rhodes-Hochreim filed a second infringement suit against International in this district. International immediately retained Watson to defend this suit. January 9, 1931, International informed Slezak by telephone that a second suit was filed against it, but sent him no copy of the complaint and made no demand on him to defend that suit. Watson prepared the answer. He did not consult Mason nor utilize his services in this second suit although he knew Slezak had retained Mason therefor. Mason was not advised of the progress of the second suit and only learned of it indirectly. Slezak never refused to defend the second infringement suit. Slezak never authorized the employment of Watson, nor did he promise directly or indirectly to pay Watson's fees.

November 7, 1932, International settled the second infringement suit. Andrews relinquished an unadjudicated and unliquidated claim of about $19,000 against Camco, of which Rhodes-Hochreim was a subsidiary, as consideration for the settlement of the second infringement suit. This settlement was made without the knowledge or consent of Slezak or his counsel. For Andrews' relinquishment of his claim against Camco, International gave its note to Andrews for $25,000 which included $6,000 for his services in making the settlement. International has never paid Andrews any part of this $25,000, but has withheld royalties from Slezak against this unpaid amount.

International claims to have expended $57,244.95 (itemized in footnote [3]) in defense of the two infringement suits brought by Rhodes-Hochreim and that such amounts were paid for attorneys' fees and disbursements, infringement bonds and settlement of the second infringement suit. International claims it has the right to offset this amount against royalties due to Slezak.

Beginning September 16, 1929, and each quarter-year thereafter, International has failed and refused to pay licensors any royalties; including $45,000 minimum royalties and a substantial amount of earned royalties in addition. Beginning December 16, 1932, and each quarter-year thereafter, until the expiration of the five-year foreign minimum royalty period, International has refused to pay Slezak any foreign royalties. International admits that it has withheld $53,990 in United States royalties and $7,875 in foreign royalties, totaling $61,875 without interest. International has failed to furnish royalty statements on at least sixteen different due dates, the delays ranging from twelve days to two years and eleven months. No royalty statements have been furnished from January 1, 1936, to the present time.

December 8, 1932, plaintiffs sent International and Andrews the thirty-day notice of default specified in paragraph 25 of the contract. On January 27, 1933, plaintiffs filed their first suit at bar. Thereupon International attempted to terminate Slezak's employment contract and withheld further salary payments thereunder.

## Interpretation of License Agreement.

Slezak's obligations to pay expenses and counsel fees ceased upon the favorable termination of the first infringement suit against International. Section B of paragraph 29 states that Slezak's obligations to defend suits against International continue only until the first of such suits has been successfully terminated. The license agreement states:

"* * * but such provisions as to defense of such suit or suits shall only apply until there has been a final adjudication upholding the validity of such patent or patents; * * * After adjudication of any one of such case or cases, upholding the validity of said patents involved in such case or cases all expenses of all suits, actions and proceedings shall be sustained and borne by the purchaser or his assignees."

The validity of the Slezak patents could not be adjudicated in an infringement suit against International. The parties to the contract interpreted the phrase "validity of said patents" as meaning the right of International to practice the Slezak inventions. In an infringement suit against International, its right to make, sell, and use the mechanism disclosed and claimed in the Slezak patents might be attacked because of infringement of a third party's patent. The successful defense of such an infringement suit against International was considered by the contracting parties as an adjudication upholding the "validity" of the Slezak patents and that expression must be construed as meaning the successful defense of an infringement suit. Such an adjudication would be a holding that International was free to operate under the Slezak patents without infringing any other patent.

The words and acts of defendants throughout these proceedings sustain the interpretation given above. "The practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction of a contract is as much a part of it as any thing else. There is no surer way to find out what parties meant, than to see what they have done." Brooklyn L. Insurance Co. v. Dutcher, 95 U.S. 269, 273, 24 L.Ed. 410. "The parties having placed on their contract a practical construction which harmonized with their understanding at the time of its execution, that construction became a part of the contract itself and the court will therefore adopt it." Nelson v. Ohio Cultivator Co., 6 Cir., 188 F. 620, 623. When the first Rhodes-Hochreim infringement suit was brought against In-

| | | |
|---|---|---|
| 3 Fish, Richardson and Neave | $ 4,392.18 | |
| Hammond & Littell | 2,393.39 | |
| Stone, Boyden, Mack & Hahn | 1,714.25 | |
| Ward, Crosby & Neal | 1,850.00 | |
| Watson, Bristol, Johnson & Leavenworth | 9,208.56 | |
| Watson, Bristol, Johnson & Leavenworth | 6,774.32 | |
| Premiums on infringement bonds | 5,500.00 | |
| | $32,244.95 | |
| Settlement of second infringement suit | 25,000.00 | |
| | $57,244.95 | |

ternational, the vice president of International wrote to Slezak as follows:

"Enclosed herewith is Bill of Complaint served on us, on April 22nd, in an action brought by Rhodes-Hochreim Manufacturing Company against us for alleged infringement of their patents.

"Under the terms of your contract with Mr. A. M. Andrews, dated June 16, 1928, you are to defend any litigation attacking the validity of the patents mentioned in that contract with you.

"Please have your attorneys make suitable answer to this complaint and take the necessary precautions to protect our mutual interests.

"We have asked our attorneys, Messrs. Fish, Richardson & Neave (Mr. Maurice Landers) 5 Nassau Street, to cooperate with your attorney to the fullest, and we would appreciate your attorneys giving them advice as to the progress of the proceedings."

International, in its answer to the bill of complaint, places the same construction upon the license agreement. In paragraph 23 it states:

"That by reason of the various suits brought against the defendant on the ground that the said plaintiffs did not have a valid patent. * * *"

This interpretation is fully borne out by other evidence in the case.

At the trial defendant attempted to shift its position and invoke a totally different meaning to the words of the license agreement. It contended that Slezak is obliged to defend all infringement litigation against International until the Slezak patents have been held valid. If a case involving invalidity of the Slezak patents is never prosecuted, then Slezak must continue indefinitely to defend suits against International. This interpretation would impose an unlimited and unbounded expense on Slezak. It is an absurd interpretation and falls by reason of its absurdity.

■ Under paragraph 29 of the license agreement, plaintiffs were obliged to pay the expense of defending a single suit against International charging infringement by the Slezak scale mechanism. This obligation was fully discharged when the first infringement suit was successfully defended. In such defense, plaintiffs were obliged only to retain competent counsel. This plaintiffs did. There is and can be no suggestion that Mr. Mason was incompetent. He tried and tendered himself ready to try the first infringement suit until it was decided by the Court of Appeals. In fact, his argument was used in the Court of Appeals. If International chose to employ other and additional counsel, it was free to do so under the contract, but could not place that cost on Slezak.

Accordingly, I find plaintiffs have fully performed their obligations under the license agreement of June 16, 1928. Plaintiffs are not liable for any counsel fees or other expenses incurred or paid by International in connection with either one of the Rhodes-Hochreim infringement suits. Plaintiffs are not chargeable with any expense incident to the settlement of the second Rhodes-Hochreim infringement suit.

Defendants have broken the license agreement of June 16, 1928, by their failure and refusal to pay royalties due to plaintiffs.

### Dictograph Products Company, Inc.

■ In the first suit, plaintiffs seek to hold Dictograph Products Company, Inc., jointly liable with International for all royalties due. The record furnishes no basis for this contention. After execution of the license agreement and incorporation of International, a contract was entered into between International and Dictograph, whereby Dictograph was to manufacture the ticket scales for International on a cost-plus basis. All obligations of International to Dictograph, amounting to approximately $1,000,000, have been paid. Dictograph is a manufacturing company and has been in business for over thirty years. It had no interest in the scales and had nothing to do with their operation. Plaintiffs rely on the fact that Andrews and his family owned more than 90 per cent. of the stock of International and more than 50 per cent. of the stock of Dictograph and that the two companies at different times had certain common officers and directors. Dictograph owns a block of International stock, but International owns no stock of Dictograph. Dictograph cannot be held liable for royalties. It was not a signatory or privy to the license agreement.

### Rescission.

The first suit was filed in 1933. It was brought pursuant to plaintiffs' rights under the license agreement. In that suit no claim for cancellation was made by the plaintiffs.

696

January 13, 1936, plaintiffs wrote defendant on the stationery of Morgan, Finnegan & Durham, their counsel. After calling attention to the nonpayment of royalties and the failure to furnish quarter-annual statements, they said:

"Your defaults and breaches of the covenants of said agreement of June 16, 1928, * * * have been continuous and cumulative over a period of approximately three years, and demonstrate an intention on your part to disregard and abandon said license agreement and to continue to use the inventions of said license agreement in violation of the covenants and obligations thereof.

"You are hereby notified that, unless you pay the defaulted royalties and render the statements and accountings specified in the foregoing paragraphs 1 to 6 within twenty days from the mailing of this letter, said license agreement will be considered cancelled. * * *"

January 21, 1936, International replied:

"You are hereby advised that there has never been and there is not now any intention on the part of the undersigned to disregard or abandon the license agreement referred to in your letter, nor is there any intention on the part of the undersigned to continue to use the inventions involved in said license agreement, except in accordance with the terms thereof.

"You are fully aware of the action pending in the District Court of the United States for the District of Delaware, commenced by yourselves against the undersigned, in which the undersigned has filed its counterclaim for the sum of $52,144.86 for breach of the covenants of said license agreement on your part. It is the position of the undersigned that the claims made in these counterclaims are a valid set-off against any royalties which may be due to you and exceed in amount any sums which might otherwise be owing from the undersigned to yourselves or either of you on account of any royalties which may have accrued under said license agreement."

■ June 17, 1936, plaintiffs brought the second suit claiming that the license agreement was canceled by letter of January 13, 1936, and asked the court to rescind the license agreement effective as of the date of that letter. In the letter plaintiffs declared that certain breaches of the contract on the part of defendant amount to cancellation. Plaintiffs rely upon Oscar Barnett

Foundry Co. v. Crowe, 3 Cir., 219 F. 450. Suit was there brought to rescind a license agreement upon the ground that the licensee had broken a covenant to make and sell a patented article. By its own admission in that case defendant had ceased entirely to manufacture under the license. Furthermore, in that case the license "was continuing in its nature, but contains no provision for its rescission for any default or defaults on the part of either or both of the parties in the performance or observance of its stipulations or provisions." Two salient facts clearly distinguish that case from the case at bar. Here International has evinced a purpose to exercise its rights under the license and in fact has done so by engaging in the manufacture of scales. Paragraph 25 of the license agreement in this case expressly provides for rescission and plaintiffs have not attempted to follow that provision.

Although mistaken, International assumed it had the right to withhold payment of royalties because of the expenses it had incurred incident to the infringement suits. At the time, these expenses equaled or possibly exceeded the royalties due. On more than one occasion International declared its willingness to pay royalties if the court should determine it was liable therefor. Under the circumstances of this case, the nonpayment of royalties was not such inequitable conduct as justifies the court in rescinding the license agreement.

"Forfeiture of a license does not follow from the single fact that the licensee has broken covenants which were made by him when accepting the license; unless the parties expressly agreed that such a forfeiture should follow such a breach. For example, in the absence of such an agreement, a mere nonpayment of a license fee does not entitle a party to a decree of annulment. And even where such an agreement is made, it will not always be enforced by the Courts, and will never be self-enforcing. * * * Indeed, forfeitures are not favored by the law; and Courts are always prompt to seize upon any circumstance which indicates an agreement or an election to waive one. * * *" Walker on Patents, 6th Ed., § 357.

Plaintiffs are not entitled to have the license agreement rescinded.

■ During the hearing of the case, defendant sought to introduce evidence that plaintiffs had recently procured or applied for a patent covering a coin slot machine

known as an "Astrolograph Machine" and had failed to assign the same to defendant. After hearing argument, the court excluded the evidence on two grounds: (1) That such failure could not justify the nonpayment of royalties; and (2) that the horoscope machine did not come within the provisions of the license agreement. The court now affirms that ruling.

In the first suit, plaintiffs are entitled to an accounting of royalties under the license agreement of June 16, 1928, and defendant's counterclaim must be dismissed. As to Dictograph Products Company, Inc., the bill of complaint must be dismissed.

In the second suit the bill of complaint and the counterclaim must be dismissed.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.