B & J MANUFACTURING
COMPANY, Plaintiff,

v.

HENNESSY INDUSTRIES,
INC., Defendant.

No. 73 C 2174.

United States District Court,
N. D. Illinois, E. D.

Dec. 19, 1979.

James P. Hume, Hume, Clement, Brinks, Willian & Olds, Ltd., Jerry Hosier, Hosier, Niro & Daleiden, Ltd., Chicago, Ill., for plaintiff.

James W. Kissel, Sidley & Austin, James C. Wood, William A. Van Santen, Jr., Wegner, Stellman, McCord, Wiles & Wood, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

FLAUM, District Judge:

This cause having been tried by the court without a jury, the court, having heard the testimony and examined the exhibits properly placed in evidence by the parties, having heard the arguments of counsel, and being otherwise fully advised in the premises, hereby enters the following findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

This court has jurisdiction over this matter under 28 U.S.C. § 1338(a). Venue is admittedly proper in this district.

Plaintiff, B & J Manufacturing Co. (B & J), is an Illinois corporation having a principal office and place of business at 700 West 193rd Street, Glenwood, Illinois.

Hennessy Industries, Inc. (Hennessy) is a Delaware corporation having a principal office and place of business at 520 Lively Boulevard, Elk Grove Village, Illinois.

B & J is the holder of three patents—*viz.*, United States Patent 3,552,469 (the '469 patent), entitled "Tire Bead Seater", United States Patent 3,675,705 (the '705 patent), entitled "Tire Bead Seating and Inflation Apparatus", and United States Patent 3,805,871 (the '871 patent), entitled "Tire Mounting, Bead Seating and Inflation Apparatus and Method of Use". It alleges that these patents have been infringed by Hennessy.

Hennessy denies the charge of infringement and makes an alternative affirmative defense of license. In addition, it claims that those claims of the patents that it is said to have infringed are invalid.

For the reasons set forth below, the court holds that all of the contested claims of the three patents are valid, that the accused devices infringe the claims of those patents that B & J alleges they infringe, and that the sale by Hennessy of the accused devices as kits and their sale in any form after its receipt of the latter from counsel for B & J dated September 16, 1974, constituted unlicensed infringement. The court rules, further, that an accounting must be held to ascertain the compensation owing to B & J. Treble damages and attorney's fees will not be awarded to B & J. It is, however, entitled to an award of costs.

## BACKGROUND

The tubeless tire made its first appearance on American automobiles in the early

1950's. By the middle of that decade, the tubeless tire had become standard equipment on passenger cars manufactured in this country. Indeed, it also replaced tires equipped with inner tubes for use on trucks and other off-the-road vehicles.

The introduction of tubeless tires led to the appearance of a new problem in tire inflation. When its upper and lower beads[1] are in sealing contact with the wheel rim, a tubeless tire can be inflated through the valve stem located in the wheel.[2] However, it often happens that, owing to the vicissitudes of, *inter alia*, the shipping, storing, or packaging of a tubeless tire, when it has been mounted on a wheel, at least one of its beads is found not to be in sufficient sealing contact with the wheel rim. In such a case, the inflation of the tire cannot, without the use of some mechanical aid, be accomplished entirely through the valve stem, as the air injected into the cavity would escape through the opening, or window, between the unseated bead and the wheel rim proximate to it. Thus, a new method had to be devised to facilitate the inflation of these problem tires.

As a result of an industry-wide effort, numerous devices were fashioned to accomplish this task. These apparatus all required the creation of a mechanical seal between the tire bead and the wheel rim. Some of them involved the use of a constricting band, by means of which the circumference of the tire sidewall was constricted, thereby causing the interior rim of the sidewall, the tire bead, to move into sealing engagement with the wheel rim. Others operated by enclosing the window within a larger sealed space, and then seating the tire beads by injecting air into this closed container.

Neither of these methods of tubeless tire inflation were without its drawbacks. The use of constrictor bands was always hazardous for the would-be tire inflator. The appearance of radial ply and steel-belted radial ply tires on the market added to the problem, as they rendered constrictor bands

ineffective and/or harmful to the tires themselves. Difficulties also attended the use of many of the devices that achieved a mechanical seal by the second means mentioned above. For instance, to employ a device on the order of the Omega Band bead seater marketed by Bruce Caulkins, Inc. (BCI), patented as United States Patent 3,280,880, entitled "Method of and Apparatus for Inflating Tubeless Tires", filed January 29, 1965 and issued on October 25, 1966, it was necessary to have a different mechanical sealing part for each tire, each rim diameter, and each rim size. The apparatus disclosed by the Muller patent, United States Patent 3,461,938, entitled "Tire Mounting and Inflation System", filed March 9, 1967 and issued on August 16, 1969, required the application of 10,000 lbs. of pressure against the wheel rim in order to seat the beads of and inflate "problem" tubeless tires.

Bruce D. Caulkins (Caulkins) holds a Bachelor's degree in science and a Master's degree in physics, with minors in chemistry and mathematics. He worked for Uniroyal between the end of his formal education in 1929 and 1945, in connection with its business of manufacturing and selling tires. In 1945, he joined the Atlas Supply Company (Atlas), for whom Uniroyal had manufactured tires during at least the latter portion of Caulkins' tenure with Uniroyal. At Atlas, Caulkins was responsible for selecting the tires and equipment relating thereto that would be made available to Standard Oil service stations under the Atlas brand name. Caulkins returned to Uniroyal in 1960 as the Director of Quality Control of their automobile tire manufacturing operations. He continued to work for Uniroyal until August 1, 1963, at which time he commenced devoting himself to the affairs of BCI, a basically one-person enterprise that he had incorporated in March, 1963. From the beginning, BCI marketed tire-related products developed by Caulkins. In 1965, BCI started selling the aforementioned

---

1. The interior rings of tubeless tires are known as beads.

2. Tube tires are typically inflated in this manner.

Omega Band, which was the invention of Caulkins and others. This product was a commercial success, and, in 1968, BCI recruited Caulkins' friend Lee M. Corless (Corless) to provide some office help.

Corless received a B.S. in mechanical engineering from Michigan State University in 1930. With the exception of the war years, during most of which he headed an Army school for motor mechanics, Corless spent the next thirty-three years in the employ of several American automobile manufacturing companies. Principally, his duties with them involved experimental automotive engineering.

Not long after becoming associated with BCI, Corless began to go out into the field to talk to BCI's customers and discuss with them whatever problems that they might have had with BCI's products. At that time, BCI was primarily selling Omega Bands, and so Corless became educated in the above-mentioned problems involved in the inflation of tubeless tires. He came to the conclusion that there had to be a "better answer" to those problems than the mechanical sealing devices then in use, and he set out to find it.

Corless' experiments resulted in the issuance to him of the three patents in suit. He assigned his rights under the patents over to BCI, which, on June 1, 1971, granted Hennessy a nonexclusive license under the then-issued '469 patent, the then-pending application which shortly thereafter issued as the '705 patent, and the about-to-be-filed application which matured into the '871 patent. Subsequently, in July, 1971, B & J acquired BCI's entire right, title and interest in and to the patents in suit.

The Coats Company, Inc. (Coats), a subsidiary of Hennessy, is its supplier and manufacturer of tire changing machines. Coats tire changing machines are sold by Hennessy with or without tubeless tire inflation apparatus, according to its customers' specifications. Hennessy also markets the Coats-made tire inflation apparatus parts

sold separately for field installation on Coats brand tire changers. These OEM machines and kits are the devices accused of infringement in this suit.[3]

## PATENT VALIDITY

*The '469 Patent*

The application that lead to the issuance of the '469 patent was filed on February 16, 1969. The application was amended in January, 1970, before the Patent Office had taken any action thereon, at the request of Corless. The patent was issued without further amendment on January 5, 1971, all of its claims being allowed. Finally, in June of 1971, BCI, then the holder of the patent, filed a disclaimer with the Patent Office in which it disclaimed several claims of the issued patent.

Hennessy challenges the validity of this patent on two grounds. First, it alleges that the '469 patent is invalid under 35 U.S.C. § 102 for anticipation. Second, it maintains that the claims of the patent are invalid under 35 U.S.C. § 103, because they are obvious in light of the prior art.

Before evaluating the merits of these arguments, the court deems it proper to review certain general principles of patent law. 35 U.S.C. § 282 states that

[a] patent shall be presumed valid. Each claim of a patent . . . shall be presumed valid independently of the validity of other claims . . . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

This statutory presumption is not conclusive; rather, it shifts the burden of proof to the party attacking the validity of the patent. *Republic Industries, Inc. v. Schlage Lock Co.*, 592 F.2d 963 (7th Cir. 1979). In general, clear and convincing evidence of invalidity is necessary to overcome this presumption. *Laser Alignment, Inc. v. Woodruff & Sons, Inc.*, 491 F.2d 866, 871 (7th

---

**3.** Tire changers provided with factory installed tubeless tire inflation apparatus are called "OEM machines". The apparatus sold separately in a form suitable for retrofitting—i. e., installing them on tire changer machines already in the field—will be referred to as "kits".

Cir.), *cert. denied,* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974). The presumption is strengthened when the record before the Patent Office Examiner, the file wrapper, discloses that the prior art references, or equivalent references, relied on by the party claiming invalidity were considered by the Examiner during the prosecution of the application for a patent. *Id.* On the other hand, the presumption does not exist against evidence of prior, non-equivalent, art not before the Patent Office, *The Allen Group v. Nu-Star, Inc.,* 575 F.2d 146 (7th Cir. 1974) (*per curiam*), and invalidity need only be proven in such cases by a preponderance of the evidence. The burden of proof imposed upon the party attacking a patent's validity is similarly reduced when allowed claims are subsequently disclaimed. *Hoover Co. v. Mitchell Manufacturing Co.,* 269 F.2d 795 (7th Cir. 1959); 4 Deller's Walker on Patents § 286, at 237 (1965).[4] With these principles in mind, the court will turn to the arguments raised by Hennessy against the validity of the '469 patent.

35 U.S.C. § 102 provides, in pertinent part, as follows:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

In *Namirowski v. Nabisco, Inc.,* 421 F.Supp. 349 (N.D.Ill.1976), *aff'd mem.,* 567 F.2d 392 (7th Cir. 1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1612, 56 L.Ed.2d 62 (1978), this court concluded that a purported invention is anticipated, hence unpatentable under 35 U.S.C. § 102, "only where, except for insubstantial differences, [a previous patent, printed publication or domestic product] *contains all of the same elements in the same fashion to perform an identical function.*" 421 F.Supp. at 353 (quoting *Popeil Bros., Inc. v. Schick Electric, Inc.,* 494 F.2d 162, 164 (7th Cir. 1974)) (emphasis supplied in *Namirowski*). Thus, as the first step in deciding whether the '469 patent is void for want of novelty, the court must identify the challenged claims of said patent, and identify the elements thereof.

The '469 patent consists of 22 claims. Three of these are independent claims. The others are dependent claims.

Claim 1 discloses an

[a]pparatus for inflating tubeless tires on a vehicle wheel comprising an annular tube of larger diameter than the wheel to be received over the wheel adjacent to the rim thereof, orifice means around the inner periphery of the tube for injecting a substantially continuous ring of air under pressure through the space between the wheel rim and the bead of a non-inflated tubeless tire mounted on a wheel, and inlet means on the tube for supplying air under pressure to the interior of the tube.

Claims 2–9 and 11–15 are dependent on claim 1.[5] Claim 2 describes the angle at which the orifice means are to be aimed. Claims 3 and 4 describe different forms that orifice means might take. Claim 5 provides that the annular tube may be of a variable diameter. Claim 6 describes one such tube, a discontinuous ring whose ends are joined by a turnbuckle. Claim 7 discloses the apparatus defined in Claim 6 equipped with orifice means designed specifically so as to direct their streams of air into "the peripheral space occupied by the turnbuckle". Claims 8 and 9 describe an-

---

4. 4 Deller's Walker on Patents § 286, at 237 also points out that "[t]he construction of a patent, after a disclaimer has been properly entered, must be the same as it would have been if the matter so disclaimed had never been claimed". (The propriety of the entry of the disclaimer filed in connection with the '469 patent has not been challenged in this suit.)

5. Claims 10, 20, 24, 25, and 27, all of which involved the use of an auxiliary device to create a mechanical seal over the entire window, were disclaimed in June, 1971.

other type of variable-diameter tube, a discontinuous tube provided with telescoping ends. Finally, Claims 11–15 provide for varying cross-sectional shapes in which the annular tube could be fashioned.

Independent claim 16 discloses

[t]he method of inflating a tubeless tire on a vehicle wheel comprising the steps of mounting a noninflated tubeless tire on a vehicle wheel, injecting air under pressure as a substantially continuous ring into the tire peripherally around the tire through the space between the wheel rim and the adjacent tire bead to partially inflate the tire and cause the tire bead to almost make sealing contact with the wheel rim, and then completely inflating the tire by injecting air under pressure through the conventional tire valve.

Claims 17–19 are dependent upon claim 16. Claim 17 provides that the injection of air under pressure through the window shall cease substantially simultaneously with the commencement of the injection of air under pressure through the valve stem. Claim 18 modifies claim 17 by disclosing that the accomplishment of the simultaneous switch from injection via the annular ring to injection via the valve stem shall be achieved by use of a valve device. Claim 19 elaborates upon the method described in claim 16 by providing for a reservoir of air under pressure as a source for the initial injection of air into the tire via the annular ring.

Claim 21, the third and last independent claim in the '469 patent, discloses an

[a]pparatus for inflating tubeless tires on a vehicle wheel comprising an annular tube of larger overall diameter than the wheel to be received on the wheel, orifice means around the periphery of the tube and spaced radially outwardly from the periphery of the wheel for injecting air under pressure as a substantially continuous ring through the space between the wheel rim and the bead of a non-inflated tubeless tire mounted on the wheel, and inlet means on the tube for supplying air under pressure to the interior of the tube.

Claims 22, 23, and 26 are dependent upon claim 21. Claim 22 describes the inner diameter of the annular tube as larger than the diameter of the wheel, such that the tube may be received over the wheel and adjacent to its rim. It further provides that when the apparatus appears in this form, the orifice means should be located on the inner periphery of the tube. Claim 23 defines a version of claim 21 in which the outer, but not the inner, diameter of the annular tube is greater than the diameter of the wheel. Claim 26 provides that the apparatus described in claim 26, which is designed such that the annular tube rests on the wheel rim during tire inflation, should be equipped with an auxiliary device to insure that the tube is actually in sealing engagement with the wheel rim.

Hennessy argues that claims 1 and 16, and therefore the claims dependent upon them, are unpatentable because they are anticipated by United States Patent 2,874,-760, entitled "Bead Seating Device For Tubeless Tires", filed June 9, 1954, and issued to Walter F. Bishop on February 24, 1959 (Bishop).[6]

■ The Bishop patent discloses a bead seating device that operates through the use of a mechanical seal. Specifically, Bishop teaches that a tubeless tire whose beads are not in sealing contact with the wheel rim can be inflated by means of a device composed of a rigid plate so fashioned as to be able to be positioned in airtight sealing contact with the wheel rim; an extension thereof jutting outwards from the top of that plate over the sidewall of the tire that it is sought to seat; and a flexible rubber membrane that is connected on one end to the aforementioned extension of the rigid plate, and that descends from thence to the tire sidewall, the membrane being designed so as to be able to achieve airtight sealing contact with said sidewall. Bishop's specifications describe the inflation of such a tire with this device as involving the injection of air under pressure into the previously (mechanically) sealed space bounded by the

---

**6.** It is only these claims with regard to which B & J alleges infringement.

patented device and the cavity formed by the wheel and the tire along the entire circumference of the window, thereby seating the beads and inflating the tire.[7]

The file wrapper of the '469 patent discloses that the Patent Office Examiner considered Bishop during the prosecution of the application for the '469 patent. Thus, Hennessy must overcome the presumption of validity if it is to prevail on the issue of anticipation.

The court holds that Hennessy has failed to prove that Bishop is a prior patent which contained all the elements enumerated in [claims 1 and 16 of the '469 patent], which performed the same function in the same way as the [device] defined in those claims, *and* whose [purpose was] to perform the same function as was performed by the device described in those claims.

*Namirowski v. Nabisco, Inc.*, 421 F.Supp. at 354 (citations omitted) (emphasis added). The two devices plainly were intended to *perform the function of tire bead seating.* However, the other portions of the standard enunciated in *Namirowski* are not met in this case. Bishop lacks the annular tube called for in claim 1. More importantly, there exists a profound structural difference between Bishop and the '469 patent: Bishop requires the existence of a sealing mechanism as part of its bead seating apparatus, while the '469 patent requires no mechanical sealing mechanism at all.[8] This structural difference is reflected in a methodological distinction—before Bishop can be used to seat the bead of and inflate a "problem" tubeless tire, its disclosure requires the mechanical creation of a relatively air-

tight chamber enclosing the window, tire cavity, and wheel, whereas no such initial seal need be created before the bead seating and inflation process commences according to the teachings of the '469 patent. This, taken together with the evidence before the court as to how the apparatus disclosed by the '469 patent works, suggests to the court that Bishop and the '469 patent operate on the basis of fundamentally different principles. Hennessy has not presented the court with evidence which would cause it to reach any other conclusion with regard to the question of whether the devices perform the same function "in the same way".[9] Accordingly, Hennessy has failed to prove that the challenged claims of the '469 patent are unpatentable under 35 U.S.C. § 102.

■ Hennessy also argues that the '469 patent is invalid under 35 U.S.C. § 103. The defense of obviousness raises the question of inventiveness, as opposed to the question of novelty, upon which the defense of anticipation turns. As the court noted in *Illinois Tool Works v. Sweethart Plastics, Inc.*, 436 F.2d 1180, 1183 (7th Cir.), cert. denied, 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722 (1971),

[t]he obviousness test is somewhat broader in its restrictions on the issuance of valid patents, and prior art which does not render an invention anticipated may nonetheless make it obvious.

(footnote omitted).

35 U.S.C. § 103 provides that

[a] patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at

---

**7.** Bishop contains only apparatus claims. However, "[a]nticipation by a prior patent is to be *determined from the disclosure in the patent* as contained in the specification and drawings, rather than from the language or precise scope of the claims". 1 Deller's Walker on Patents § 61, at 283 (2d ed. 1964).

**8.** While the language of the independent claims of the '491 patent is broad enough to cover an annular tube large enough to seal the window, this is not said in the claims to be necessary in order for the disclosed apparatus to work. Nor

is it recommended, either in the apparatus claims or in the method claims. Indeed, the *possibility of fashioning such a tube is no* where alluded to in the patent.

**9.** It should be obvious that the court does not consider this to be a case in which "the general aspects [of the two devices] are the same and the difference in minor matters is only such as would suggest itself to one of ordinary skill in the art". *Amphenol Corp. v. General Time Corp.*, 397 F.2d 431, 438 (7th Cir. 1968).

the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

In *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court outlined the proper analysis to be followed when obviousness is at issue.

> While the ultimate question of patent validity is one of law [citation omitted], the § 103 condition, which is one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.

383 U.S. at 17, 86 S.Ct. at 694. "[T]he *Graham* analysis [is] the exclusive means by which to measure nonobviousness under section 103." *Republic Industries, Inc. v. Schlage Lock Co.*, 592 F.2d 963, 972 (7th Cir. 1979).

Hennessy refers the court to the following prior art as relevant to its claim of obviousness: United States Patent 2,874,-759, entitled "Bead Seating and Inflating Device for Tubeless Tires", filed January 12, 1953, and issued to E. G. Ranallo on February 24, 1959 (Ranallo); United States Patent 2,874,761, entitled "Bead Seating and Inflating Device for Tubeless Tires", filed August 26, 1954, and issued to A. J. Varvaro on February 24, 1959 (Varvaro); United States Patent 2,936,827, entitled "Apparatus for Mounting and Inflating

Tubeless Tires", filed June 20, 1955, and issued to M. B. Riggs on May 17, 1960 (Riggs); and United States Patent 2,500,-015, entitled "Automatic Tubeless Tire Bead Seating and Inflation Machine", filed March 10, 1955, and issued to H. S. Harrison on August 18, 1959 (Harrison).[10]

The file wrapper of the '469 patent reveals that Bishop and Harrison were considered by the Examiner during the prosecution of the application for the patent.[11] However, the other prior art mentioned above, the disclosures of which the court has examined, is no more pertinent than the two references that were considered by the Examiner: all of the above prior art references, including Bishop and Harrison, rely for their efficacy upon the creation of an initial mechanical seal in order to seat the beads of and achieve the inflation of a tubeless tire whose sidewalls do not engage the wheel in sealing contact, and they all describe and claim only apparatus incorporating and methods employing mechanical sealing devices.

Therefore, it is only necessary for the court to refer to the disclosures of Bishop, which Hennessy considers to to be by far the most pertinent prior art, in order to describe "the scope and content of the prior art". As summarized above, the teaching of Bishop is that one could seat the beads of and inflate a "problem" tubeless tire by creating a mechanical seal around the tire cavity, wheel, and window, and then injecting air under pressure into this sealed chamber.

---

**10.** The court has also studied the disclosures of United States Patent 2,786,516, entitled "Bifurcated Bead Seating Device for Tubeless Tires", filed April 15, 1955, and issued to A. A. Schreiner on March 26, 1957; United States Patent 2,910,117, entitled "Method and Apparatus for Inflating a Tubeless Tire and Seating the Beads", filed April 23, 1956, and issued to U. D. Lamerson on October 27, 1959; United States Patent 2,918,115, entitled "Bead Seating and Inflating Device for Tubeless Tires", filed December 7, 1955, and issued to H. G. Twigford on December 22, 1959; United States Patent 3,366,153, entitled "Tire Bead Seating and Inflating Means for Tubeless Tire Casings", filed

July 5, 1966, and issued to A. R. Allen on January 30, 1968; and United States Patent 3,461,938, entitled "Tire Mounting and Inflating System", filed March 9, 1967, and issued to J. L. Mueller on August 19, 1969. These patents were cited to the court at trial, but are not relied on in Hennessy's post-trial briefs. The court's conclusions as stated in the text are equally applicable to the prior art references cited above.

**11.** The file wrapper also indicates that Mueller, *see* footnote 10, *supra*, was considered by the Examiner.

Hennessy claims that the progression from Bishop's device to the apparatus disclosed in the '469 patent would have been obvious to a person skilled in the art of tire inflation because Bishop provides for the creation of "a temporary barrier, but not a seal". Before turning to the obviousness question, the court deems it appropriate to note its disagreement with this characterization of the disclosure of Bishop. The claims of the Bishop patent require the mechanical creation of an initial seal prior to inflation of the tire by the injection of air under pressure into the tire cavity. Further, while it is true that the Bishop specifications state that one portion of the sealing mechanism described in the patent may consist of a semipermeable rubber membrane, nothing in the statement explicating the purpose and function of this avatar of Bishop's sealing apparatus casts any doubt upon the fact that Bishop teaches that the creation of an initial mechanical seal is essential to the operability of the Bishop apparatus. Indeed, that statement, upon which Hennessy relies so heavily, underlines this fact.[12]

Prior to resolving the obviousness issue, it is incumbent upon the court to ascertain what the level of ordinary skill in the art of tubeless tire inflation was at the time the device disclosed in the '469 patent was invented. Hennessy has submitted no evidence as to the level or kind of education or the type of work experience typical among practitioners of this art. Rather, it has elected to describe the level of ordinary skill in the art only in terms of a hypothetical person "working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him". *Application of Winslow*, 365 F.2d 1017, 1020, 53 CCPA 1574 (1966).

It is the court's conclusion that Hennessy has failed to prove that the '469 patent is invalid for obviousness. It introduced no expert testimony to that effect at trial. Indeed, one of Hennessy's witnesses, Charles Rummler, whose testimony the court finds credible in this limited regard, acknowledges that the Corless device disclosed in the '469 patent operates in a manner "directly contrary to the teachings of the prior art", including Bishop. Upon its own review of the record before it, the court is of the opinion that Corless' invention was not an obvious outgrowth of the teachings of the prior art, but the result of his totally unprecedented approach to the problem of the inflation of "problem" tubeless tires.[13]

---

**12.** The pertinent portion of the Bishop specifications reads as follows:

Applicant prefers to use a cellular rubber for ring 80 which has communicating cells so that it is not completely impervious to air. By using this type of material for ring 80, applicant has found that sufficient inflationary air pressure can be created within the tire to cause the mounting apparatus to function properly while, at the same time, air will pass through ring 80 fast enough to substantially deflate the air chamber defined by applicant's apparatus after said tire is mounted in its ultimate position on the rim, to prevent any objectionable sudden discharge of air from said chamber when the closure member is removed from the tire and rim.

**13.** The court does not consider this to be a close case in which secondary considerations such as long felt need, failure of others, and commercial success should be weighed in assessing the validity of the '469 patent. However, as the fact finder in this case, the court does find that a long felt need did exist for an improved tubeless tire inflation apparatus that would work on the type of "problem" tires discussed in the test of this opinion. The search for "a better way" to inflate these tires was spearheaded by the rubber tire companies, particularly Firestone, whose efforts culminated in the Varvaro, Ranallo, and Bishop patents. However, this research did not succeed in solving the problem of providing a durable, cheap, efficient, easy-to-use inflator for use in the field to the satisfaction of those concerned with the inflation of tubeless tires. The technological breakthrough represented by the '469 patent succeeded in fulfilling this need, despite the fact that, as the evidence in this case demonstrates, at least some persons familiar with the tire inflation art did not even believe that Corless device could work. Finally, the court notes that while the Omega jet, BCI's commercial embodiment of the device claimed in the '469 patent, has not enjoyed overwhelming commercial success, the invention, as part of a tire changing, bead seating, and inflation apparatus, has enjoyed immense commercial success.

As Hennessy has not prevailed on either of its arguments against the validity of the '469 patent, the court rules that that patent is valid.

### The '705 Patent

The '705 patent matured from an application filed on November 16, 1970, at which time the application for what subsequently became the '469 patent was still pending in the Patent Office. After the issuance of the '469 patent, on July 29, 1971, a terminal disclaimer was filed with regard to the former application, disclaiming "the terminal part of any patent granted on [that application] which would extend beyond the expiration date of [the '469 patent]". The application was amended before the Patent Office had taken any action thereon, at the request of the applicant, which request was made in late July, 1971. The Patent Office Examiner, who was the same Examiner before whom the '469 and '871 patents were prosecuted, disallowed two claims of the application and allowed the other claims on November 3, 1971. After receiving a communication sent by Corless' attorney and filed with the Patent Office on March 17, 1972, the Examiner reconsidered his earlier action and decided to allow all of the claims of the amended application. The '705 patent was issued on July 11, 1972.

Hennessy challenges the validity of the allegedly infringed claims of the '705 patent on three grounds. First, it alleges that the claims are invalid under 35 U.S.C. § 101 on grounds of double patenting. Second, it maintains that these claims are invalid under 35 U.S.C. § 102 for anticipation. Third, it asserts that these claims are invalid under 35 U.S.C. § 103 for obviousness.

The '705 patent contains thirteen claims, including three independent and ten dependent claims. Claim 1, upon which claims 2–11 are dependent, discloses an

[a]pparatus for inflating tubeless tires on a vehicle wheel having oppositely disposed rim portions comprising tire bead seating apparatus including an annular tube of larger diameter than the wheel to surround a rim of the wheel, structure extending radially inwardly of said tube for abutment against said rim to position the apparatus with respect to the wheel, orifice means around the inner periphery of the tube for injecting a substantially continuous ring of air under pressure through the space between the wheel rim and the bead of a non-inflated tubeless tire mounted on the wheel, and inlet means on the tube for supplying air under pressure to the interior of the tube; said tire bead seating apparatus having no mechanical sealing element capable of sealing a gap between the wheel and the tire.

Claims 2–4 describe the above-mentioned "positioning" means, which also constitute handles. Claims 5–10 elaborate upon various aspects of what claim 1 refers to as the "inlet means". Claim 11 reveals a form of the annular tube in which the tube is made up of a plurality of detached arcurate segments, the ends of each of which are sealed, and each of which is equipped with its own inlet through which to receive air under pressure.

Claim 12, the second of the '705 patent's independent claims, discloses

[t]he method of inflating a non-inflated tubeless tire on a vehicle wheel comprising the steps of applying an annular orifice structure to one side of a tire and wheel assembly, positioning the orifice structure with respect to the wheel by abutment of structure extending radially inwardly from said orifice structure against the wheel, injecting air under pressure from said orifice structure into the tire peripherally around the wheel through the space between the wheel rim and the tire bead in sufficient amounts, without using a mechanical seal, so that more air is injected into the tire than may escape with the result that the tire will be expanded to cause the tire beads to sufficiently close on the wheel rims to permit complete inflation through the conventional tire valve, and then completely inflating the tire by injecting air under pressure through the conventional tire valve.

Claim 13, the third independent claim of the '705 patent, discloses an

[a]pparatus for inflating tubeless tires on a vehicle wheel having oppositely disposed rim portions comprising tire bead seating apparatus including an annular orifice structure having orifice means provided around a periphery of larger diameter than the diameter of a wheel to surround the rim of a wheel for injecting air under pressure around the periphery of the wheel through the space between the wheel rim and the bead of a non-inflated tubeless tire mounted on the wheel in sufficient amounts, without using a mechanical seal, so that more air will be injected into the tire than may escape with the result that the tire will be expanded to cause the beads to sufficiently close on the wheel rims to permit complete inflation through the conventional tire valve, structure extending radially inwardly of said annular orifice structure for abutment against said wheel to position the apparatus with respect to the wheel, and inlet means on said orifice structure for supplying air under pressure to the orifice means.

Claims 1, 12 and 13 are the allegedly infringed claims, and it is the validity of these claims that is challenged by Hennessy.

■■■■ The doctrine of double patenting grows out of the recognition by the Supreme Court in *Miller v. Eagle Manufacturing Co.*, 151 U.S. 186, 14 S.Ct. 310, 38 L.Ed. 121 (1894), of the principle that "no patent can issue for an invention actually covered by a former patent". 151 U.S. at 198, 14 S.Ct., at 315. It is a set of judicially created rules, *Ropat Corp. v. McGraw-Edison Co.*, 535 F.2d 378, 380 (7th Cir. 1976); *Application of Braithwaite*, 379 F.2d 594, 602 (Cust. & Pat.App.1967) (Smith, J., concurring), which act to deny the patentability of co-pending applications regarding an invention upon which a patent has already been granted to the same inventor. *See generally*, 1 Deller's Walker on Patents § 62 (2nd ed. 1964). Double patenting analysis therefore is employed where an application that satisfies the test of patentability under 35 U.S.C. §§ 102, 103 has been filed by a person who already holds a relevant patent.

As the Court of Customs and Patent Appeals observed in *Application of White*, 405 F.2d 904, 906, 56 CCPA 870 (1969), such a subsequent invention will fall into one of three categories: unobvious, obvious, and same invention. The subsequent application may represent an attempt to twice claim the same invention. Or it may be an attempt to patent an obvious improvement or modification of a claim patented in the first-to-issue patent. Finally, it may be that the new invention constitutes an unobvious variant of the claims of the previously-issued patent.

■■■■ The impact of the double patenting doctrine on an invention varies according to which of the three categories the invention falls into. *See generally Application of Thorington*, 418 F.2d 528, 57 CCPA 759 (1969); *Application of Eckel*, 393 F.2d 848, 55 CCPA 1068 (1968). If the invention is "unobvious", in the sense discussed in the preceding paragraph, there can, of course, be no double patenting. *Application of White*, 405 F.2d at 906. If the invention is the "same invention", the "same invention" aspect of double patenting analysis will apply. This branch of the double patenting doctrine has been anchored in 35 U.S.C. § 101, which provides that

[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor . . . .

(emphasis added). It is intended to bar an inventor from obtaining multiple patents on a single invention. The filing of a terminal disclaimer does not avoid the effect of this type of double patenting. If the invention is "obvious", within the meaning of the previous paragraph, the "obviousness" type of double patenting analysis will apply. This branch of the doctrine has no statutory basis. Rather, it is

a judicially-created doctrine grounded in public policy . . . and primarily intended to prevent prolongation of monopoly.

*Application of Thorington*, 418 F.2d at 534. Accordingly, this type of double patenting objection can be defeated by a terminal disclaimer. *Id.*

Because that portion of the life of the '705 patent extending beyond the expiration date of the '469 patent has been disclaimed, Hennessy can only challenge the validity of the '705 patent under the "same invention" aspect of double patenting doctrine. Thus, the question before the court is whether claims 1, 12, and 13 of the '705 patent constitute the "same invention" that was claimed in the '469 patent.

The parties agree that the law governing the definition of "same invention" is to be found in *In re Eckel*, 393 F.2d 848, 55 CCPA 1068 (1968), and its progeny. At least under the circumstances of this case, the court concurs.

As refined in *Application of Vogel*, 422 F.2d 438, 57 CCPA 920 (1970), and *Application of Avery*, 518 F.2d 1228 (Cust. & Pat. App.1975), the test is one of cross-readability. This test, in the words of the *Vogel* court, asks

whether one of the claims could be literally infringed without literally infringing the other. If it could be, the claims do not define identically the same invention.

In assessing Hennessy's charge that claims 1, 12, and 13 of the '705 patent are invalid for double patenting, the court bears in mind the fact that the presumption of validity is applicable in this context. *TSC Industries, Inc. v. International Harvester Co.*, 406 F.2d 53 (7th Cir. 1968). Moreover, the court notes that the presumption is strengthened where, as here, the Examiner who approved the issuance of the later patent not only referenced to the earlier-issued patent, but was the same Examiner who allowed the latter patent.

The court holds that Hennessy has not succeeded in proving that the claims are invalid for double patenting. The claims of the '469 patent could be infringed without literally infringing claims 1 and 12 of

the '705 patent by manufacturing and using an annular bead seater which is not equipped with the positioning/holding apparatus disclosed in the latter patent. Claim 13 of the '705 patent is not cross-readable on the claims of the '469 patent both for this reason and because claim 13 does not require that the bead seating apparatus consist of an annular "ring".

The court also rejects Hennessy's anticipation and obviousness attacks upon the '705 patent. 35 U.S.C. § 102(b) does not represent a statutory bar against the patentability of the claims of the '705 patent. The device disclosed in the '469 patent was not first publicly demonstrated or sold until mid-April, 1970, less than one year prior to the date of the filing of the application that matured into the '705 patent. Hennessy does not suggest, and the court does not find, that any of the claims subsequently added to this application by amendment are not entitled to enjoy the effective filing date of November 16, 1970. Thus, none of the circumstances mentioned in section 102(b) is present in this case. *Illinois Tool Works, Inc. v. Solo Cup Co.*, 461 F.2d 265 (7th Cir.), *cert. denied*, 407 U.S. 916, 92 S.Ct. 2441, 32 L.Ed.2d 691 (1972), teaches that the '469 patent does not constitute prior art with regard to the '705 patent within the meaning of 35 U.S.C. § 102(a). Nor is it considered to be prior art with regard to the '705 patent for the purposes of 35 U.S.C. § 103. *See, e. g., Nashua Corp. v. RCA Corp.*, 431 F.2d 220 (1st Cir. 1970); *Weatherhead Co. v. Drillmaster Supply Co.*, 227 F.2d 98, 101 (7th Cir. 1955); *Application of Braithwaite*, 379 F.2d 594, 600 n. 4 (Cust. & Pat.App.1967); *Application of Braithwaite*, 379, F.2d 594, 603 n. 5 (Cust. Pat. App.1967) (Smith, J., concurring); *Application of Robeson*, 331 F.2d 610, 612 n. 2, 51 CCPA 1271 (1968).[14] Hence, the only prior art reference with regard to the '705 patent that was not available as prior art for the purposes of sections 102(a) and 103 in determining the validity of the '469 patent is United States Patent 3,669,175, entitled

---

14. Hennessy does not contend that the '469 patent constitutes prior art with regard to

the '705 patent under section 102(a) or section 103.

"Bead Expander", filed September 29, 1969, and issued to B. L. Sorenson, et al., on June 13, 1972. This patent, like the prior art relative to the '469 patent, teaches the necessity of a mechanical seal to the bead seating of "problem" tubeless tires. Accordingly, Hennessy's anticipation and obviousness arguments fail for the same reasons that similar contentions concerning the validity of the '469 patent failed.

Therefore, the court finds that Hennessy has not successfully met its burden of proving claims 1, 12, and 13 of the '705 patent invalid.

### The '871 Patent

The '871 patent, which is a continuation-in-part of the '705 patent, matured from an application filed in the Patent Office on July 26, 1971.[15] The application was amended at the request of the applicant, which request was made by a letter filed on September 5, 1972, before the Patent Office had taken any action thereon. On September 15, 1972 and September 25, 1972 the Patent Office Examiner, who was the same Examiner who had already approved the '469 patent and the '705 patent, rejected several independent claims of the application as obvious in light of the '469 patent. On November 9, 1972, Corless' assignee, B & J, filed an amendment adding new specifications and proposed claims 14–17 to his application and requesting a declaration of interference with respect to the added claims. On the same date, B & J also filed a terminal disclaimer disclaiming the "terminal part of any patent granted on the above-identified application which would extend beyond the expiration date of [the '469 patent]." After proposed claims 14–17 prevailed in the interference proceeding with certain claims of United States entitled "Improved Tire Bead Seater", Patent 3,683,991, filed February 11, 1971 and issued to F. H. Ruhland on August 15, 1972, the Examiner allowed all of the claims except proposed claim 15 on January 9, 1973.

He rejected that claim and demanded the deletion of a portion of the specifications that had been added to the application in the amendment dated November 9, 1972. This language was rejected by him on the ground that it was impermissibly directed to "new matter" under 35 U.S.C. § 132. By means of a letter filed February 1, 1973, the offending claim and specification language were deleted from the application, and the '871 patent was issued on April 23, 1974.

As issued, the '871 patent contains 16 claims. These include four independent and nine dependent apparatus claims and two independent and one dependent method claims.

Claims 1–3 were originally filed in the Patent Office as claims 12–14 in Corless' application that matured into the '705 patent. They were deleted from that application by the claimant's amendment filed July 29, 1971. The remarks accompanying that letter requesting the Patent Office to amend the application explained that "[c]laims 12–14 have been cancelled because the structure recited therein is being disclosed and claimed in a Continuation in Part Application".

Claim 1 discloses an

[a]pparatus for inflating tubeless tires on a vehicle wheel having oppositely disposed rim portions comprising a tire mounting device including a base, means on said base to receive a vehicle wheel, clamp means for engaging the wheel, said device including means for mounting and de-mounting tires on a wheel held by said clamp means, tire bead seating apparatus on said base including an annular tube of larger outer diameter than the wheel to surround the lower rim of a wheel set onto the base, orifice means around the inner periphery of the tube for injecting a substantially continuous ring of air under pressure through the space between the wheel rim and the bead of a non-inflated tubeless tire mounted on the wheel

---

**15.** 5 Deller's Walker on Patents § 432, at 32 defines a continuation-in-part as

> an application filed during the lifetime of an earlier application filed by the same appli-

cants repeating some substantial position or all of the earlier application and adding matter not disclosed in the earlier application. (footnote deleted).

and inlet means on the tube for supplying air under pressure to the interior of the tube.

Claim 2 defines the above-mentioned clamp means and inlet means and characterizes the annular tube as a series of discrete arcuate segments arranged in a circular pattern. Claim 3 adds a mechanism to the apparatus described in claim 1 which could move the apparatus towards or away from the wheel and tire assembly.

Claim 4 is an independent apparatus claim, upon which claims 5–9 are dependent. It discloses an

[a]pparatus for inflating tubeless tires on a vehicle wheel having oppositely disposed rim portions, comprising a tire mounting device including a base, means on said base to receive a vehicle wheel, said device including means for mounting and de-mounting tires on a wheel tire bead seating apparatus on said base including an annular orifice structure including orifice means provided around a periphery of larger diameter than the diameter of a wheel to surround the lower rim of a wheel set onto the base for injecting air under pressure around the periphery of the wheel through the space between the wheel rim and the bead of a noninflated tubeless tire mounted on the wheel in sufficient amounts, without using a mechanical seal, so that more air will be injected into the tire than may escape with the result that the tire will be expanded to cause the tire beads to sufficiently close on the wheel rims to permit complete inflation through the conventional valve, and inlet means on said orifice structure for supplying air under pressure to the orifice means.

Claim 5 characterizes the orifice structure of claim 4 as an annular tube. Claims 6 and 7 modify claim 4 in the same way that claims 2 and 3 modify claim 1. Claim 8 adds a bead breaking structure to the apparatus defined in claim 4, and further describes the orifice structure as a ring-like tubular passageway provided with a gap through which the bead breaking structure may pass. Claim 9 teaches the addition of a

shelf structure, equipped with an orifice structure in the form of an annular passageway on its periphery, to the top of the base of the mounting device.

Claims 10 and 11 are two of the three method claims of the '871 patent. Claim 10 teaches

[t]he method of inflating a tubeless tire on a vehicle wheel comprising the steps of mounting a vehicle wheel and non-inflated tubeless tire assembly on a support surface of a tire mounting device, injecting air under pressure into the tire peripherally around the wheel through the space between the wheel rim and the tire bead adjacent the support surface in sufficient amounts, without using a mechanical seal, so that more air is injected into the tire than may escape with the result that the tire is expanded to cause the tire beads to sufficiently close on the wheel rims to permit complete inflation through the conventional tire valve, and then completely inflating the tire by injecting air under pressure through the conventional tire valve.

Claim 11 adds to the above-recited method the step of lifting the tire so that the top bead makes contact with the wheel rim prior to the injection of air into the cavity formed by the tire carcass and the wheel.

Claim 12 discloses an

[a]pparatus for inflating tubeless tires on a vehicle wheel having oppositely disposed rim portions, comprising a tire mounting device including a base, means on said base to receive a vehicle wheel, said device including an orifice for injecting air under pressure through the space between the wheel rim and the bead of a non-inflated tubeless tire mounted on the wheel in sufficient amounts, without using a mechanical seal, so that more air will be injected into the tire than may escape with the result that the tire will be expanded to cause the tire beads to sufficiently close on the wheel rims to permit complete inflation through the conventional valve, and inlet means on said orifice structure for supplying air under pressure to the orifice means.

Claim 13 reveals

[t]he method for inflating a tubeless tire on a vehicle wheel comprising the steps of mounting a vehicle wheel and non-inflated tubeless tire assembly on a support surface of a tire mounting device, injecting air under pressure into the tire through the space between the wheel rim and the tire bead adjacent the support surface in sufficient amounts, without using a mechanical seal, so that more air is injected into the tire than may escape with the result that the tire is expanded to cause the tire beads to sufficiently close on the wheel rims to permit complete inflation through the conventional tire valve, and then completely inflating the tire by injecting air under pressure through the conventional tire valve.

Claim 14, upon which claims 15 and 16 are dependent, teaches an

[a]pparatus for seating the bead of a tubeless tire on the rim of a wheel and inflating the tire comprising:

 a. a plenum in the form of a discontinuous ring having an inlet for receiving air under relatively high pressure therein;

 b. a plurality of jets in communication with said plenum for forming relatively high velocity jets of air enamating from said plenum; and

 c. said jets being positioned for directing said jets of air into the tire between the rim and the bead.[16]

Claim 15 describes the plenum of claim 14 as at least partially accurate. Claim 16 discloses the presence of at least 12 jets in the apparatus disclosed in claim 14.

Hennessy raises several arguments against the validity of the claims of the '871 patent. First, it maintains that claims 12, 14, 15, and 16 are invalid under the late claiming doctrine of *Muncie Gear Works, Inc. v. Outboard Marine & Manufacturing Co.*, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171

(1942). Second, it contends that the patent is invalid for double patenting. Third, Hennessy claims that the claims at issue are void under the doctrine of *Lincoln Engineering Co. v. Stewart Warner Corp.*, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008 (1938). Fourth, it says that the claims are unpatentable for obviousness.

■ In pertinent part, 35 U.S.C. 102(b) provides that a person shall not be entitled to the issuance of a patent if the invention was

in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

The late claiming doctrine of *Muncie Gear* holds that an inventor may not achieve by amending a pending application what he is prohibited by section 102(b) from accomplishing by way of a new application. *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677 (7th Cir. 1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978). Hennessy contends that claim 12 is invalid under this doctrine because it was added by amendment to the application that ultimately matured into the '871 patent on September 5, 1972, which is more than one year after the first sales of the device embodying the Corless inventions, which occurred in May, 1970. Hennessy also argues that claims 14–16 are invalid for late claiming on the ground that they were added to the application on November 9, 1972, which is more than a year after Hennessy publicly disclosed its discontinuous ring inflater, which disclosure occurred in September, 1971.

■ The court will first address Hennessy's argument concerning the validity of claims 14–16. 35 U.S.C. § 132 [17] and 37 C.F.R. § 1.118 [18] prohibit the introduction

---

**16.** Claim 14 is identical with claim 1 of the Ruhland patent.

**17.** 35 U.S.C. § 132 provides, in pertinent part, that

 [n]o amendment shall introduce new matter into the disclosure of the invention.

**18.** 37 C.F.R. § 1.118 states that

 [i]n original applications, all amendments of the drawings or specifications, and all additions thereto, must conform to at least one of them as it was at the time of the filing of the application. Matter not found in either,

of "new matter" into an application by way of amendment.[19] By allowing claims 14–16, all of which were added to the application that matured into the '871 patent by the amendment dated November 9, 1972, the Examiner in the Patent Office clearly found them not to constitute "new matter" with respect to either the '705 patent or the application for what became the '871 patent. This determination is presumed to be correct. *Technion Instruments Corp. v. Coleman Instruments Corp.*, 385 F.2d 391, 393 (7th Cir. 1967). Hennessy has not presented the testimony of any qualified experts in opposition to this determination,[20] and the court concludes that these claims do not constitute "new matter" with respect to either the '705 patent or the original application for the '871 patent. Thus, there was no late claiming with regard to these claims. *See, e. g., Rel-Reeves, Inc. v. United States*, 534 F.2d 274, 280, 209 Ct.Cl. 595 (1976); *Acme Highway Products Corp. v. D. S. Brown Co.*, 431 F.2d 1074 (6th Cir. 1970), *cert. denied*, 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971); *Binks Mfg. Co. v. Ransburg Electro-Coating Corp.*, 281 F.2d 252, 257 (7th Cir.), *cert. granted*, 364 U.S. 926, 81 S.Ct. 353, 5 L.Ed.2d 265 (1960), *writ dismissed*, 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961); *Illinois Tool Works, Inc. v. Continental Can Co.*, 273 F.Supp. 94, 123 (N.D.Ill.1967), *aff'd*, 397 F.2d 517 (7th Cir. 1968).[21]

In regard to the *Muncie Gear* objection to claim 12, the court notes that the Examiner implicitly found that it, too, did not insert "new matter" into the then pending appli-

cation. Again, Hennessy attempts to rebut the presumption of correctness attached to this determination solely by observing that no prior claim in any of the three patents in suit literally claimed what claim 12 claims—"an orifice". However, once again, Hennessy has failed to rebut this presumption.

The original application for the '871 patent adequately disclosed the subject matter of claim 12. For instance, claim 4 is identical to claim 12, except that it substitutes

an annular orifice structure including orifice means provided around a periphery of larger diameter than the diameter of a wheel to surround the lower rim of a wheel set onto the base for injecting air under pressure around the periphery of the wheel

for the latter claim's "an orifice for injecting air under pressure". These differences are not significant. "Orifice means" comprehends "an orifice"—"inlet means" is used in the same application to describe one inlet. The specifications expressly state that it is not necessary to employ an annular orifice structure in order to utilize the invention disclosed in the application. The "periphery" language is plainly intended merely to reflect the fact that air to be injected into the window must be injected from a position beyond the wheel rim if a bead is to be seated without using a mechanical seal. This requirement is clearly present in the language of claim 12. Hence, the court is not convinced that the Patent Office Examiner's conclusion that claim 12 did not constitute "new matter"

involving a departure from or an addition to the original disclosure, cannot be added to the application even though supported by a supplemental oath, and can be shown or claimed only in a separate application.

**19.** "New matter" is matter that an original application discloses to a person skilled in the applicable art. *See Technion Instruments Corp. v. Coleman Instruments Corp.*, 385 F.2d 391, 393 (7th Cir. 1967); *Application of Wolfensperger*, 302 F.2d 950, 985, 49 CCPA 1075 (1962). The Manual of Patent Examining Procedure, 3rd Ed., instructs Examiners to "be on the alert to detect new matter", 706.03(*o*), and to reject amendments introducing new matter into pending applications. 608.04; 706.03(*o*).

**20.** Indeed, Charles Rummler, a witness for Hennessy whose sole area of expertise is patent law, virtually conceded at trial that the discontinuous ring found in claims 14–16 was disclosed by the '705 patent.

**21.** The court also finds that these claims meet the tests of 35 U.S.C. § 120, *see Bendix Corp. v. Balax, Inc.*, 421 F.2d 809 (7th Cir.), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1970), *Technion Instruments Corp. v. Coleman Instruments Corp.*, 385 F.2d 391, 393 (7th Cir. 1967), such that they are entitled to enjoy the effective filing date of the '705 patent.

with respect to the application that matured into the '871 patent was erroneous.

This does not, however, resolve the question of whether claim 12 is invalid for late claiming, because the filing date of the application that matured into the '871 patent, July 26, 1971, is more than twelve months after May, 1970. Consequently, late claiming will only be avoided if claim 12 is entitled, under 35 U.S.C. § 120,[22] to enjoy the benefit of the earlier filing date of the '705 patent, which was co-pending with the original application for the '871 patent.

The court finds that claim 12 is entitled to the benefit of an effective filing date of November 16, 1970.[23] *Technion Instruments Corp. v. Coleman Instruments Corp.*, 385 F.2d 391 (7th Cir. 1967), teaches that

[t]o come within the purview of 35 U.S.C. § 120, the following qualifications must be met by the later patent application. 1) The same invention must be disclosed. 2) It must be filed by the same inventor. 3) It must be filed before patenting of the first application. 4) It must contain a specific reference to the earlier-filed application. If the conditions are met, the effective filing date of the later application is that of the earlier application.

385 F.2d at 393. These tests are met in this case. The application that matured into the '871 patent, as originally filed, adequately disclosed the same invention disclosed by the then-pending application for the '705 patent. Specifically, claim 12 of the '871 patent describes, with two modifications, the apparatus of claim 13 of the '705 patent.[24] The former claim differs

from the latter in that it lacks claim 13's positioning/holding structure and contains the additional element of the modified tire mounting device. Both of these modifications were taught by the original disclosures of the application for the '705 patent. In sum, the application for the '705 patent, which was co-pending with the application for the '871 patent, adequately, *see Bendix Corp. v. Balax, Inc.*, 421 F.2d 809 (7th Cir.), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1970), disclosed the same invention as that claimed in claim 12. The amendment inserting claim 12 into the application for the '871 patent was filed by Corless' appointed attorneys. Finally, the application for '871 patent contained a specific reference to the co-pending application.

Because claim 12 is entitled to the benefit of an effective filing date of November 16, 1970, Hennessy's charge of late claiming must be rejected.

The court concludes that the same fate must befall Hennessy's *Lincoln Engineering*-based attack on claims 1–13 of the '871 patent. These claims involve the combination of a modified tire mounting device and a tire bead seater and inflater in one apparatus. This combination had been known in the tire inflation art prior to the filing of the application for this patent, *see, e. g.*, the above-mentioned Riggs patent, but always in the context of tire bead seating and inflation mechanisms reliant for their efficacy upon an initial mechanical seal. After revolutionizing the field of tubeless tire inflation through his invention of the device

---

**22.** 35 U.S.C. § 120 reads as follows:

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States . . . by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

**23.** Hennessy does not contend otherwise.

**24.** Claim 13 was inserted into the application for the '705 patent by an amendment filed with the Patent Office July 29, 1971. By allowing the claim, the Examiner found it not to constitute "new matter" with respect to the application. Although it questions the permissible breadth of claim 13, Hennessy has not challenged this determination, and the court concludes that the presumption of its correctness has not been rebutted.

revealed by the '469 patent, Corless natural-ly sought to patent that invention in combi-nation with a tire mounting device.

In *Lincoln Engineering*, the Supreme Court held that

[t]he mere aggregation of a number of old parts or elements which, in the aggre-gation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention. And the improvement of one part of an old combination gives no right to claim that improvement in combination with other old parts which perform no new function in the combination.

303 U.S. at 549–550, 58 S.Ct. at 664–665 (footnotes omitted). However, at the very least, this ruling has been severely limited by the Court's subsequent decision in *Wil-liams Manufacturing Co. v. United Shoe Machinery Co.*, 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537 (1942). This court shares the view of the Second Circuit Court of Appeals that

subsequent history militates against an expansive application of the Court's rea-soning in *Lincoln Engineering*.

*Jamesburg Corp. v. Litton Industrial Prod-ucts, Inc.*, 586 F.2d 917, 924 (2d Cir. 1978), *cert. denied*, 440 U.S. 961, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1979).

 Under the facts of this case, the court can see no reason to apply the doc-trine of *Lincoln Engineering* to invalidate these claims. Any device that infringes them would also infringe one of the earlier patents. The disclaimer of that portion of the life of the '871 patent extending beyond the life of the '469 patent eliminates the possibility that the upholding of these claims could improperly extend Corless' mo-nopoly over his bead seating invention be-yond the 17 year statutory limit. Indeed, the addition of the elements concerning the tire changer machine narrows rather than broadens the claims. Further, this is not a lawsuit against a contributory infringer. *See, Jamesburg Corp. v. Litton Industrial Products, Inc.*, 586 F.2d at 924. Moreover, this case does not concern an attempt to patent a combination of which all the ele-ments are old.[25] Finally, all of the elements of the claims must cooperate to perform the desired end of the tire bead seating and inflation. *Cf. Reese v. Elkhart Welding and Boiler Works, Inc.*, 447 F.2d 517 (7th Cir. 1971).[26] Therefore, the court does not find the rule of *Lincoln Engineering* appli-cable to this case, and Hennessy's over-claiming argument falls.

Turning next to Hennessy's double pat-enting objection to the '871 patent, the court again notes that a terminal disclaimer has been filed in the Patent Office disclaim-ing the portion of the life of the '871 patent extending beyond the life of the '469 pat-ent. Hence, the validity of the '871 patent can only be challenged under the "same invention" aspect of the double patenting doctrine. As such, the question before the court is whether the claims of the '871 patent are cross-readable on the claims of the '705 patent or the '469 patent.

Upon examination of the three patents, the court finds that the claims of the '871 patent are not cross-readable on the claims of the earlier filed patents. None of the former claims requires the "inwardly ex-tending structure" that is an element of each of the latter claims. Moreover, with the exception of claims 14–16, each of the claims of the '871 patent require the pres-ence of a modified tire mounting device, which is not required by the claims of the other two patents.

Accordingly, Hennessy has not proven the '871 patent invalid for double patenting.

Hennessy does not contend, and the court does not find, that the '469 patent or the '705 patent constitute prior art with

**25.** The Corless inflater does not constitute prior art with regard to the '871 patent. If it did, the court would find the combination claims inval-id under section 103, despite the difficulties encountered by Hennessy's engineers in fash-ioning a device embodying the combination.

**26.** The *Reese* court did not consider the impact of *Williams Manufacturing Co.* upon the rule of *Lincoln Engineering.*

regard to the '871 patent, within the meaning of 35 U.S.C. § 103. Therefore, the court rejects Hennessy's obviousness attacks on the validity of claims 1, 4, 5, 8, 10–12 and 14–16 of the '871 patent for the same reasons that it rejected similar contentions concerning the validity of the '469 patent.[27]

Accordingly, the court finds all of the contested claims of the '871 patent to be valid.

## INFRINGEMENT

35 U.S.C. § 271(a) provides that [e]xcept as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

Infringement may be shown in one of two ways. On the one hand, infringement is proved if the accused device falls literally within a claim. As the Supreme Court remarked in *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950),

[i]n determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

339 U.S. at 607, 70 S.Ct. at 855. On the other hand, under the doctrine of equivalents, infringement will also be found, despite the fact that the accused device is not an exact copy of the patent device,

"if [the former] performs substantially the same function in substantially the same way to obtain the same result." [citation omitted]. The theory on which it is founded is that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape". [citation omitted].

339 U.S. at 608, 70 S.Ct. at 856. In either case, it is the claims of the allegedly infringed device that define the scope of the patent grant. *CTS Corp. v. Piher International Corp.*, 527 F.2d 95, 100 n.16 (7th Cir. 1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976). And in either case, the burden of proving infringement rests on the party alleging it. *Decker v. Webcor, Inc.*, 289 F.2d 357, 360 (7th Cir. 1961), *cert. denied*, 368 U.S. 970, 82 S.Ct. 445, 7 L.Ed.2d 398 (1962). Infringement must be proven by a preponderance of the evidence.

The structures accused of infringement in this suit are the Coats manufactured, Hennessy marketed inflaters known as Inflat-Air and Air-Flate. Each has been manufactured in varying forms so that they may be attached to the different models of Coats tire changers. However, neither party contends that these minor variations effect the infringement issue in any way.

The Inflat-Air structure is an annular tube bent into a circular arc of approximately 260°. The ends of the tube are seated, and a gap exists between them. About 20 holes of equal size are located on this tube. Except for the holes adjacent to the gap, each of the holes is separated by an equal distance from the holes on either side of it. All of the holes are directed towards the center of the tire changing machine.[28]

The Air-Flate device is a U-shaped steel tube whose ends are sealed. The tube embraces an arc of approximately 260°. It mounts four nozzles, each of which is directed toward the center of the tire changing machine. These nozzles lie virtually on the circumference of a circle, and they are spaced at intervals of 90°.

James Holladay (Holladay), defendant's primary technical expert and the developer of the Air-Flate structure, conceded at trial that these two accused devices operate on the basis of the same principle. This court

---

**27.** Hennessy does not contend that any prior art references other than those previously mentioned in this opinion render the '871 patent's claims void for obviousness.

**28.** Coats and Hennessy are no longer making or selling the Inflat-Air device. The Air-Flate structure was first developed by Hennessy in mid-1973.

agrees, finding that the differences between the two devices are reducible to the scientific fact that a decrease in the number of holes injecting air into a space can be compensated for by increasing the size of—and the quantity of air emerging from—the remaining holes.

B & J accuses the Inflat-Air device of infringing claims 1–4, 11, and 16–19 of the '469 patent, claims 1, 12 and 13 of the '705 patent, and claims 1, 4, 5, 8, and 10–16 of the '871 patent. It alleges that the Air-Flate structure infringes claims 6–19 of the '469 patent, claims 12 and 13 of the '705 patent and claims 4, 8, 14 and 15 of the '871 patent.

Hennessy's primary argument against infringement is that neither of the accused devices involves a "substantially continuous ring of air under pressure", and that B & J is estopped by Corless' dealings with the Patent Office and by a statement made by Corless at trial from asserting any broader scope for its patent rights, either through the literal language of its claims that do not expressly require said ring or by way of the doctrine of equivalents.

Hennessy maintains that the amendment of the application that matured into the '469 patent, which amendment was filed on January 19, 1970, before the Patent Office had taken any action on said application, created a file wrapper estoppel that prevents the application of the doctrine of equivalents to find infringement in the case of an accused device which lacks the feature of a "substantially continuous ring" of air inserted into the language of the claims of the application for the '469 patent by that amendment. It then states, citing *C-Thru Products v. Uniflex, Inc.*, 262 F.Supp. 213, 217–219 (E.D.N.Y.1966), *aff'd*, 397 F.2d 952 (2d Cir. 1968), that Corless could not avoid this file wrapper estoppel by filing a later, broader application with the Patent Office.

The doctrine of file-wrapper estoppel is that an applicant who acquiesces in rejection of his patent claim and accordingly modifies it to secure its allowance, will not subsequently be allowed to expand (or narrow) his claim by interpretation to include limitations originally given up, or their equivalents.

*Ellipse Corp. v. Ford Motor Co.*, 452 F.2d 163, 168 (7th Cir. 1971), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972) (citations omitted).

In this Circuit, the law is that "[a] necessary condition for the establishment of a file wrapper estoppel is that the patentee must have narrowed his claim in response to an objection by the Patent Office in order to obtain the patent". *Bishman Manufacturing Co. v. Stewart & Warner Corp.*, 380 F.2d 336, 340 (7th Cir.), *cert. denied*, 389 U.S. 897, 88 S.Ct. 216, 19 L.Ed.2d 214 (1967). Since no objection—or any other communication from the Patent Office to Corless—preceded the amendment in question, the doctrine of file wrapper estoppel is inapplicable to this case.[29]

Hennessy also urges the court to restrict the claims of Corless' patents to devices employing a "substantially continuous ring of air under pressure" because he stated at trial that without such a ring, no device not including a mechanical sealing element could in fact seat the beads of and inflate a problem tubeless tire. In light of Hennessy's contention that its devices accomplish this allegedly impossible result, the court finds this argument somewhat disingenuous. The court also notes that Corless' expertise in fluidics—the art relevant to making such a determination—has not been established.

While the court is of the opinion that the purpose of the amendment was merely to reiterate to the Patent Office the fact that, unlike all of the prior art—including the Bishop patent referred to in the

---

29. If this were not so, *Application of Jentoff*, 392 F.2d 633, 640–641, 55 CCPA 1026 (1968), holds that the proper course is not to invalidate any subsequently filed claims on the ground that they impermissibly attempt to avoid a file wrapper estoppel, but to construe them as subject to the estoppel. Hennessy has, in this case, requested that the court follow this course of action.

letter requesting the entry of the amendments at issue—the '469 device does not require the use of a mechanical seal,[30] it is not necessary for the court to resolve the file wrapper estoppel questions at this time. This is because there is no occasion to resort to the doctrine of equivalents—hence, file wrapper estoppel is unavailable as a defense—where the claims in suit read literally upon the accused structure. *Paper Converting Machine Co. v. FMC Corp.*, 409 F.2d 344, 353–354 (7th Cir.), *cert. denied*, 396 U.S. 877, 90 S.Ct. 154, 24 L.Ed.2d 136 (1969).

The court finds that the accused devices do, in fact, operate by injecting a "substantially continuous ring of air" into the window. The court comes to this conclusion after having witnessed the actual operation of Corless' commercially sold embodiment of the '469 invention, the Omega jet, and a videotape of the operation of the accused Air-Flate structure. The court has found the testimony of, and, to an even greater extent, the in-court demonstrations conducted by, plaintiff's expert witness, George B. Richards, to be particularly helpful in terms of furthering its understanding of the operation of the various devices and of the principles of fluidics that underlie their operation.[31] The court has concluded that the evidence concerning the air-flow tests conducted by Holladay is not persuasive evidence to the contrary because of the fact that they involved the spraying of liquid paint by the inflater's air jets, which substance concededly has different air flow characteristics than does gas or air. Finally, the court, as a factual matter, simply rejects Hennessy's scientific explanations of the operation of the accused devices, which, if pressed to their irresistible logical conclusion, would even teach that the apparatus claimed in the '469 parent itself does not operate by reason of the injection of a substantially continuous ring of air into the window.

These major points of dispute having been resolved, the court is left with a number of minor defenses raised by Hennessy against the charged infringement. The court finds all of these arguments without merit.

In its Post Trial Brief, Hennessy argues that the Inflat-Air structure does not infringe any of the claims relied on by B & J because it "does not inject one peripherally around the wheel." The court disagrees, because, as noted above, the court construes the use of the terms "periphery" and "peripherally" in the claims, in this context, as solely indicating that the air must be injected into the window from its outside periphery. Hennessy also maintains therein that infringement of claims 1–4 and 11 of the '469 patent is avoided by virtue of the fact that those claims "required that the orifice structure be placed *over* the wheel, not under as in the Inflat-Air". However, these are equivalent procedures, and, as Hennessy raises no file wrapper estoppel defense with regard to any aspect of the claims other than the "substantially continuous ring of air" language, infringement exists in this respect under the doctrine of equivalents despite the fact that the claims may not be literally infringed. Further, Hennessy claims non-infringement of method claims 17 and 18 of the '469 patent on the grounds that, in the Inflate-Air structure, injection of air through the tire valve is initiated before the discontinuance of the injection of air via the inflater, and that said discontinuation is achieved by use of a foot pedal. These are legally insignificant distinctions. The Inflat-Air device relies, in this respect, on substantially the same method of operation as the relevant claims of the '469 patent: the inflater achieves sufficient bead seating so that the tire can be inflated via the tire valve; the injection of air through the valve then inflates the

---

**30.** It may indeed be true, as that letter indicates, that without the one mechanical seal, the Bishop device would not work. Such, in any case, is the teaching of that patent. Further, if it did function without a mechanical sealing element, the Bishop device would be working

according to fundamentally different principles than those taught by the patent.

**31.** The court notes that Hennessy has offered the testimony of no expert with comparable expertise in the area of fluidics.

tire; and this inflation occurs after the bead seating device has done its work. Finally, in its Reply Brief, Hennessy suggests that the '469 patent is not infringed because it requires an unbroken tube, the entire periphery of which is virtually over-populated with orifices. The court rejects this strained reading of the patent.

Having considered the arguments raised by Hennessy and having examined the patents and the accused device, the court holds that each of the claims cited by B & J is infringed by the Inflat-Air structure, either literally or by operation of the doctrine of equivalents.

Turning to the question of infringement of the claims of the three patents by the Air-Flate device, the court observes that Hennessy asserts the same non-infringement defenses with regard to the claims of the '469 patent that it raised in connection with the charges of infringement of those claims by the Inflat-Air apparatus. Those defenses are equally without merit in this context. The court also finds Hennessy's challenge to the allegations of infringement of claim 12 of the '705 patent and claims 4 and 8 of the '871 patent on the ground that the Air-Flate structure does not inject air "around the periphery" of the wheel to be unpersuasive because, as intimated above, the court construes this language in the claims as signifying that the air under pressure is to be injected into the window from the outside thereof. Nor does the court subscribe to Hennessy's restrictive reading of claim 12 of the '705 patent. Hennessy would have it that the Air-Flate structure does not infringe that claim if B & J has shown that ambient air plays a role in the operation of the device (which, of course, Hennessy denies). But the court does not read the claims so narrowly. The claim only requires the injection from the orifice structure into the window of "sufficient" air under pressure to seat the bead to the extent that the tire can be inflated through the tire valve. It does not preclude the

participation of ambient air, caused by the injection of air from the orifice structure, in the seating process. In either case, it is the jets emitted by the inflater that form the substantially continuous ring, even though a portion of that ring may consist of air not injected from within the inflater. Finally, Hennessy denies infringement of claims 12 and 13 of the '705 patent and claims 4, 8, 14, and 15 of the '871 patent on the ground that the Air-Flate structure is U-shaped, not circular. This is a legally insignificant distinction.

Based upon its examination of the patents in suit and the Air-Flate device, the court holds that each of the claims cited by B & J is infringed, either literally or by operation of the doctrine of equivalents, by that structure.

▮ In conclusion, the court rules that B & J has proven that the Inflat-Air structure infringes claims 1–4, 11, and 16–19 of the '469 patent, claims 1, 12, and 13 of the '705 patent, and claims 1, 4, 5, 8, and 10–16 of the '871 patent and that the Air-Flate device infringes claims 16–19 of the '469 patent, claims 12 and 13 of the '705 patent, and claims 4, 8, 14, and 15 of the '871 patent.[32]

### LICENSE

As mentioned above, Hennessy became a non-exclusive licensee under the patents in suit under June 1, 1971. It now claims that this license constitutes an affirmative defense to the charge of infringement. B & J, on the other hand, contends that the license only granted Hennessy the right to make, use, and sell OEM machines. Consequently, it argues that Hennessy's manufacture and sale of Inflat-Air and Air-Flate "kits" was unlicensed. Indeed, B & J maintains that the sale of these kits constituted a breach of the license sufficient to render its purported termination of the license in November, 1971, effective. Alternatively, B & J says that the license was terminated by it in 1974 because of Hennessy's removal

**32.** Because the court has found actual infringement, it will not consider B & J's estoppel argument.

of the patent marking notice in violation of the terms of the license agreement.

The parties filed cross-motions for summary judgment on the license issues well before the trial. This court, in an opinion dated October 19, 1976 (Opinion), which appears at 194 U.S.P.Q. 496, held that Hennessy could not assert a license defense against the charge of infringement with regard to the manufacture and sale of kits, and that, in the event that such kits were found to infringe the patents in suit, their manufacture or sale did not constitute a breach of the licensing agreement. The court reserved judgment on the patent marking question.

Both parties have asked the court to reconsider this decision. After hearing substantial amounts of evidence at trial on the questions involved therein, the court reaffirms the conclusions that it reached in the Opinion. As to the patent marking issue, the court rules that B & J effectively terminated the license agreement in 1974.

*Scope of the 1971 Licensing Agreement*

The language in the licensing agreement that pertains to the question of whether BCI granted Hennessy the right to make, use or sell kits is as follows:

LICENSOR hereby grants to LICENSEE a nonexclusive license on the terms and conditions hereinafter set forth to make, have made, use and sell Tire Mounting Machines incorporating bead seating and inflation apparatus claimed in the following Patents and Patent Applications.

Hennessy argues that the word "incorporating" is ambiguous as to the time and place of incorporation, and that it should be construed against the scrivener, BCI, which was B & J's predecessor-in-interest. Hennessy further contends that Robert Hennessy (RH), the President of Hennessy, who conducted the negotiations with Caulkins that led to the granting of the license, reasonably believed that he had obtained for his company the right to make, use or sell kits as well as OEM machines. Next, Hennessy suggests that, on account of his years of dealings with Hennessy while he was with Atlas, Caulkins knew about Hennessy's *modus operandi*, which included a general practice of making new improvements available as conversion kit accessories to previous purchasers of its tire changers. Because Caulkins never expressly told RH that that policy could not be followed with regard to his bead seating apparatus, Hennessy claims that this case falls within the purview of Restatement of Contracts § 233(b), which states that

where a party manifests his intention ambiguously, knowing or having reason to know that the manifestation may reasonably bear more than one meaning, and the other party believes it to bear one of those meanings, having no reason to know that it may bear another, that meaning is given to it.

Accordingly, Hennessy insists that the word "incorporating" should be construed to include incorporation of the bead seating and inflation apparatus into tire mounting machines in the field as well as in the shop.

■■■ The court is not persuaded by Hennessy's argument. First, the terms of the license themselves indicate that the parties intended the license to cover only OEM machines. The grant, after all, is to "make, have made, use and sell *Tire Mounting Machines* incorporating" Corless' inventions, not to "make, have made, use and sell *bead seating and inflation apparatus* for incorporation into Tire Mounting Machines". Moreover, since BCI had no patent rights with regard to "Tire Mounting Machines" *per se*, the only reasonable construction of the language of the grant is that it covered OEM machines and nothing more.

Second, even granting that, under *Ortman v. Stanray Corp.*, 437 F.2d 231 (7th Cir. 1971), parol evidence is admissible even in an "integrated" contract to discover what the parties truly meant by the term "incorporating", the court finds Hennessy's contentions unconvincing. Caulkins may well have been familiar with Hennessy's general policy of providing owners of old Coats tire changers with access to new improvements by marketing them as conversion kit accessories. However, RH could not have "rea-

sonably" believed that the license included the grant of a right to do so in this case. While this precise question never arose prior to Hennessy's actual marketing of kits in September, 1971, other questions as to the scope of the license had already been explicitly resolved.[33] Specifically, when Hennessy initially offered to obtain exclusive rights to make and market the patented devices in any form, Caulkins turned it down. Hennessy then proposed that it be able to manufacture and sell the devices in the form of a platform equipped with the apparatus as well as in connection with its sales of tire changing machines, although it acknowledged that it would not be licensed to manufacture hand-held devices like the Omega jet, the above-mentioned embodiment of the '469 patent. This suggestion, too, was rejected, as Caulkins would not allow Hennessy to make an inflation stand. Indeed, RH testified at trial that Caulkins "refused to relent as to that item". It should have been clear to RH that Caulkins intended to permit Hennessy to make and sell only OEM machines, as any other use by it of the patents would inherently undercut his efforts to sell the hand-held Omega jet ring, particularly insofar as Caulkins was familiar with Hennessy's standing in the tire changer market, which—given customer loyalty and the importance of reputable brand names and organization in marketing—would have allowed them to preempt the market for "retrofitting".[34] Thus, any belief that RH may have had that the agreement granted Hennessy the right to make and sell kits would have been unreasonable.[35]

Additionally, the court does not believe that RH, or any other responsible officer of Hennessy, in fact so understood the contract on June 1, 1971. The court is of the opinion that RH never thought about the question of whether kits fell within the scope of the license until he was faced with B & J's objections after the kits were marketed. See note 33, supra.

For these various reasons, the court again holds that the license agreement did not grant Hennessy the right to make, use, or sell inflater kits covered by the Corless patents in suit.

### Manufacture and Sale of Inflat-Air Kits as Breach

Hennessy first publicly demonstrated a tire changing machine equipped with an Inflat-Air structure at an industry show in Cincinnati, Ohio, in mid-September, 1971. The Inflat-Air device employed at the show was designed and built immediately before the show, and was flown down to Cincinnati at literally the last minute and retrofitted onto (i. e., attached to) a tire changing machine.[36]

The machine was well received. In fact, it was so well received that owners of Coats tire changers asked if they could buy the Inflat-Air apparatus as an accessory which they could retrofit into their old tire changing machines. RH then made the formal decision to offer them kits, and their queries were answered in the affirmative.

Immediately after the Cincinnati show, Hennessy, with the aid of B & J personnel, shipped the Inflat-Air-equipped tire changing machine that it had displayed there to Germany, where it was demonstrated at an industry show at the end of September. Evidently, the sale of kits was more aggressively pursued at the European show, and it came to the attention of B & J.

---

**33.** The court believes that this question was not broached during the negotiations leading to the execution of the license agreement because, prior to the signing of that agreement, Hennessy did not intend to rely upon the license and did not have any idea about whether or not the device could be made and sold as a kit.

**34.** If, as seems reasonable, a kit could be made that would fit on tire changers made by Coats and still fit on those made by other companies, such a grant would have totally eliminated Caulkins' potential market.

**35.** Obviously, the court also finds that Caulkins had no reason to suspect that the use of the word "incorporating" in the license agreement was ambiguous in the sense now suggested by Hennessy.

**36.** It had been designed to be able to be made and sold in kit form.

On October 5, 1971, B & J's President, Wayne E. Jenson (Jenson), having been apprised of these developments, made an angry phone call to RH. Jenson's ire was aroused because he felt Hennessy had not been licensed to make or sell kits. Jenson threatened to cancel the licensing agreement if the kits were not withdrawn from the market, stating that the sale of kits threatened to interfere with his ability to sell the Omega jet rings that he had purchased from BCI along with its entire right, title, and interest in and to the patents in suit in July, 1971.

Three days later counsel for B & J sent Hennessy a letter stating that his client regarded the sale of Inflate-Air kits as a breach of the above-quoted paragraph of the license agreement. In addition, counsel wrote that the letter constituted written notice of breach as required by section 8 of the contract, and that if the breach was not cured, the license would be terminated in thirty days, in accordance with that provision.[37]

There followed a period of negotiations, during which the parties discussed the possibility of settling the dispute out of court. Although these discussions continued, B & J considered the license agreement terminated as of November 8, 1971. Finally, the negotiations collapsed and, on February 28, 1972, B & J returned Hennessy's check covering the royalty payments that Hennessy felt were due and owing for the last quarter of calendar year 1971. It continued thereafter to refuse to accept other tendered royalty payments.[38]

■ As mentioned above, the court, in its previously published opinion, ruled that Hennessy's manufacture and sale of the kits did not constitute a breach of the licensing agreement. In reaching this decision, the court relied on three facts. First and foremost was the fact that the agreement is an integrated contract lacking any express condition prohibiting Hennessy from making or selling kits.[39] Second was the fact that the inference of an implied negative condition is not "absolutely necessary" to effectuate the purpose of the agreement or to preserve either party's rights thereunder. Third was the fact that the evidence failed to show that the parties intended that such a negative condition exists.

B & J has requested that the court reconsider its decision as to the law applicable to the resolution of this dispute. In addition, it insists that the court's conclusion regarding the second and third facts that the court had stated to be critical to its ruling on this issue in the Opinion should be re-examined in light of the evidence adduced at trial. Thus B & J challenges the court's earlier disposition of this issue as erroneous both in terms of its legal predicate and its application of the law therein deemed applicable to the facts of this case.

The court disagrees with B & J on both counts. As an initial matter, the court continues to adhere to the position taken by it in the Opinion as to the law to be applied in

37. Section 8 of the license agreement states that
[i]f any breach or default in respect of any of the terms of this Agreement by either of the parties shall occur, the other of said parties shall have the right to give notice in writing specifying in detail the nature of the breach or default and if the alleged breach or default has, in fact, occurred and is not cured within thirty (30) days of the mailing of the notice, the other of said parties shall have the right to terminate this Agreement forthwith.

38. Hennessy refused to accept B & J's cancellation of the license, and, even after it ceased tendering checks to B & J, it continued to accrue royalty payments on its books until the contractual maximum of $150,000 was reached. This occurred in January, 1974, if royalties on cover sales of kits and OEM machines equipped with the Inflat-Air inflaters are to be included. The $150,000 figure was reached in August, 1974, in terms of royalties on the OEM machines only. The court has not been informed as to whether any royalties were ever so accrued by Hennessy for Air-Flate devices.

39. Section 20 of the license agreement provides:
THIS INSTRUMENT contains the entire and only agreement between the parties and it supersedes and merges all pre-existing agreements; any representation, understanding, promise or condition not expressly incorporated herein shall not be binding upon either party.

this case. That is, the court believes that where the implication of a negative covenant into an integrated agreement is not "'absolutely necessary . . . to effectuate the intention of the parties'", S. Williston § 1295, at 36 (1968) (footnote omitted), no such negative covenant should be implied as a matter of law, especially in the face of an express integration clause.

Further, the court still finds that the parties did not intend the manufacture and sale of kits by Hennessy to constitute a breach of this licensing agreement. In the Opinion, the court observed that the licensor merely meant the license to specify what the licensee could do under the agreement, and not to prohibit it from doing anything. The live testimony at trial has not altered the court's conviction in this regard. B & J claims that the trial testimony establishes that Hennessy's officers did not share this view of the meaning of the contract. Such a unilateral belief, if it existed, would not satisfy the test articulated by Williston. But the court does not so interpret the testimony of RH and his brother James, an Executive Vice-President of Hennessy, upon which B & J relies. Rather, the court views their testimony, taken as a whole, as crudely attempting to state the obvious fact that when one is granted a license to do X, it is understood that one will only do X. Of course, their

recognition of this truth does not show that any one regarded the doing of "not-X"—*i. e.*, the manufacture and sale of kits—as a breach *of the license agreement.*[40] In sum, the court remains unpersuaded that the implication of a negative covenant would "effect the intention of the parties".

 Finally, even if this were not so, the court still believes that the possibility of a patent infringement suit to protect B & J's rights as BCI's successor-in-interest under the agreement negates any inference that the implication of such a covenant is "absolutely necessary" to the effectuation of the parties' intentions. B & J suggests that the insertion by the court of a covenant not to manufacture or sell kits into the agreement is necessary because Caulkins consented to a severe limitation of royalties in exchange for such a promise and because by violating the "understanding", Hennessy totally destroyed the finite "retrofit" market to which Caulkins hoped to sell his hand held inflater. The court, however, does not regard the evidence as establishing the existence of any such *quid pro quo,*[41] and it finds the availability of relief in an infringement suit as sufficiently providing Caulkins with insurance against the destruction of the finite "retrofit" market by making available to him the retirement money that B & J says he wanted.[42]

**40.** Moreover, the testimony in question concerned the implications of Hennessy's manufacturing or selling hand-held inflaters and inflation stands, objects which Hennessy had sought the right to make and sell, not kits, which subject never came up during the negotiations.

**41.** The evidence does not establish that, during the negotiations leading to the execution of the license agreement, the parties connected the question of a limitation on royalties to the question of the scope of the grant. Rather, it seems that Hennessy was trying to obtain most possible rights *and* pay the least possible money, while Caulkins was attempting to relinquish the smallest possible portion of his patent monopoly *and* get the most possible money for licensing what he wished to license. In other words, it appears that these were two issues that were separately negotiated. This is not surprising in light of the fact that Caulkins viewed the scope of the grant as non-negotiable

while Hennessy hoped never to have to rely on the rights obtained under the license.

**42.** B & J also argues that the losses that it has allegedly incurred as a result of Hennessy's infringement of the patents cannot be recouped by means of recovery in an infringement suit. Even assuming that B & J's aspirations would be relevant in this context, the court disagrees. The court rejects B & J's claim that it wished to go into the business of manufacturing and selling tire changing machines. It is of the opinion that B & J purchased the rights under the patents from BCI in order to obtain the royalty payments that it hoped would flow to it from its licensees' sales of bead seating devices (hand-held or otherwise) utilizing Corless' invention. The court believes that B & J did not buy BCI's inventory of hand-held rings because it wished to enter the business of selling them itself, but because BCI wanted, as part of the overall transaction, to get out of that business. Therefore, an award of an accounting for the

For these reasons, the court again holds that the manufacture and sale by Hennessy of kits was not *per se* a breach of the June 1, 1971 licensing agreement.

*Removal of Patent Markings as Breach*

As a result of Jenson's angry phone call of October 5, 1971, with its threat of cancellation of the license, RH was determined to scrupulously comply with the terms of the license, as Hennessy understood them. To this end, he called Hennessy's patent lawyer, who also acted as its counsel in the trial of this case, and inquired as to whether a patent marking had to be put on the Inflat-Air device. When counsel, who had also participated in the negotiation of, and was familiar with the terms of, the license, informed him that "you had better be sure you have the patent markings on that" in order to conform to the requirements of the contract, RH ordered marking notices put on the Inflat-Air devices.[43] Thus, the marking of the Inflat-Air device represented the deliberate conclusion of counsel, who had studied the patents in suit and the prior art, that the Inflat-Air devices were made "under the license". And this conclusion was shared by RH, who had negotiated for the license and who had "reexamined" it before ordering the markings put on.

No marking notice was ever put on Air-Flate structures.

In April, 1973, as a result of the ongoing dispute with B & J that would soon—*i. e.*, on August 23, 1973—enter the Federal courts, counsel for Hennessy recommended to RH that these markings be removed and that no further patent markings be placed on the Inflat-Air apparatus. RH, in turn, ordered the markings removed. Nonetheless, owing to some bureaucratic foul-up, this was not accomplished until some time in September, 1973.

Hennessy's actions did not immediately come to the attention of B & J. Ultimately, however, they did. On August 13, 1974, a letter was sent to Hennessy from counsel for B & J notifying Hennessy, in conformity with section 8 of the license agreement, that B & J regarded Hennessy's failure to mark its inflation devices as a breach of the agreement. When this alleged breach was not timely cured, counsel for B & J sent Hennessy a letter dated September 16, 1974, which notified Hennessy that, in the event that B & J's 1971 termination of the agreement had been ineffective, the agreement was now terminated for failure to cure the alleged patent marking breach.[44]

In the opinion rendered upon the parties' cross-motions for summary judgment, the court declined to decide the marking/breach question, as noted above. At this time, with the full record before it, the court rules that the license agreement was effectively terminated by B & J by means of the letter from its counsel to Hennessy dated September 16, 1974.

Section 6 and 8 of the contract are relevant to the resolution of this issue. Section 6 of the license agreement provides that

[a]ll products made, used or sold pursuant to the license herein granted shall bear the proper legal notice as to the patent markings with respect to any pat-

---

sales of infringing, non-licensed products could make B & J whole.

**43.** This notice, which appears to have been put on every Inflat-Air structure sold or delivered by Hennessy between the time of the first delivery of Inflat-Air devices in late November or early December, 1971, and the removal of the notices in September, 1973, read as follows:
ONE OR MORE OF U.S. PATENTS 3,552,469 & OTHER PATENTS PENDING.
The notice was never amended to reflect the issuance of the '705 patent. It had been removed from the Inflat-Air structure prior to the issuance of the '871 patent.

**44.** Hennessy does not suggest, and the court does not find, that B & J waived its right to claim or is estopped by virtue of its delay in providing the notice of breach from asserting, that Hennessy's failure to mark the accused inflate devices constituted a breach of the agreement. In this connection, the court notes that B & J regarded the contract as previously cancelled, and that Hennessy has shown no reliance on, or perception by it of, any acquiescence on the part of B & J in its failure to mark these structures.

ents under which the same are made and licensed.

Section 8 of the contract states:

If *any* breach or default in respect of <u>any</u> of the terms of this Agreement by either of the parties shall occur, the other of said parties shall have the right to give notice in writing specifying in detail the nature of the breach or default and if the alleged breach or default has, in fact, occurred and is not cured within thirty (30) days of the mailing of the notice, the other of said parties shall have the right to terminate this Agreement forthwith.

(emphasis added).

 No parole evidence has been adduced by either party that sheds much light on the meaning of these provisions. However, the conduct of the parties throughout this dispute, from Hennessy's reaction to Jenson's angry phone call to Hennessy's failure to present any evidence at trial indicating that this is not so, suggests that both provisions were intended to mean exactly what they say: Hennessy was to put a patent marking notice of all products made or sold by it under the license, and its mistaken failure to do so would be grounds for termination, irrespective of its *bona fides* in so acting.

 However, even if, under the provisions of the contract itself, Hennessy's good faith in removing the notice would have saved it from termination, the court finds that Hennessy did not remove the markings in good faith. The court does not believe that this action was taken because Hennessy really believed its products to be non-infringing. In this connection, the court notes that, during the course of the long dispute with Jenson that preceded the filing of this lawsuit, Hennessy not only did not once allege non-infringement, but it repeatedly claimed that the accused Inflat-Air structure was being made and sold under the patent. No credible evidence has been presented to the court that would indicate that Hennessy, or its lawyers, had

ceased to hold this belief when the markings were secretly removed.[45] Rather, the court holds that Hennessy removed the notices in an attempt to escape the effects of the marking estoppel doctrine in the event that a lawsuit materialized, and that this decision was made, not on the basis of a good faith belief that the Inflat-Air apparatus did not infringe the patents, but on the basis of a decision to groundlessly increase the burden that would be placed upon B & J in the event of litigation, a choice perhaps made in the hope of dissuading B & J from going to court. Of course, this means that the court finds that Hennessy had not yet arrived at the non-infringement defense it relied on at trial when these events occurred.

 Hennessy's arguments against the validity of B & J's 1974 termination of the contract are easily answered. Its claim that the patent marking was first put on the Inflat-Air devices without the allegedly requisite "specific intent", if relevant, has been rejected by the court. Its next argument, that there was no need to mark because there was no infringement, has obviously met the same fate. Its suggestion that marking was optional under the license is contrary to both the mandatory language of paragraph 6 of the contract and the interpretation thereof of Hennessy and its attorney, as revealed, by, *inter alia*, their conclusion in October, 1971, that notices had to be put on products made by it under the license. Hennessy's remaining arguments—that B & J's purported termination of the contract should not be given effect because this was a minor breach, B & J suffered no damage as a result thereof, and Hennessy had previously spent much money in reliance on the contract—are sufficiently answered by observing that if Hennessy did not want B & J to have the power to terminate the contract under these circumstances, it should not have signed a contract expressly giving it such power. While forfeitures are not favored by the law, "[a]

---

**45.** In fact, Hennessy continued to accrue royalties on its books for their sales of Inflat-Air devices until some time in 1974.

provision as to the grounds on which the license may be terminated will be enforced according to its terms". 4 Deller's Walker on Patents § 410, at 645 (2d ed. 1964).

Nor do the cases relied on by Hennessy, assuming, *arguendo*, that they are all still good law, indicate that a contrary result should be reached. For the most part these cases, like *Crane Co. v. Aeroquip Corp.*, 504 F.2d 1086 (7th Cir. 1974), involved attempts to obtain cancellation or rescission in the absence of a written contractual provision authorizing such a remedy. Such cases are obviously inapposite here. *Krell v. Bovaird Supply Co.*, 83 F.2d 414 (10th Cir. 1936), is not pertinent to the resolution of this case because in that case the relevant contract

[did] not provide that it may be canceled for any and every breach. Neither [did] it provide that it may be rescinded for a breach of any covenant contained therein, whether it be dependent or independent.

83 F.2d at 416. In *Slezak v. Andrews*, 21 F.Supp. 688 (D.Del.1937), the remedy of cancellation was denied licensors because they failed to comply with the terms of the contractual provision governing their contractual right to rescission. No such failure is alleged to have occurred—or did occur—here. *Indiana Manufacturing Co. v. Nichols & Shepard Co.*, 190 F. 579, 585 (C.C. Mich.1911), concerns the enforceability of a liquidated damage clause, not a provision allowing termination of a license. In *I. F. Laucks, Inc. v. Balfour Guthrie & Co., Ltd.*, 35 U.S.P.Q. 206, 216 (W.D.Wash.1937), the court refused to enforce a termination provision in a license agreement where the licensee's breach of a minimum price provision of the contract *was in good faith* and the equities otherwise inclined the court in that direction. The element of good faith and the minor nature of the breaches were also central to the refusals of courts to enforce termination clauses in the context of late payment of small amounts of royalties in *Carr v. Jaeger Mach. Co.*, 69 F.2d 434 (7th Cir. 1934), and *Standard Stoker Co. v. Brewster*, 277 F. 783 (7th Cir. 1921). Finally, in *Foster House Supporter Co. v. Taylor*, 184 F. 71 (2d Cir. 1911), the court ruled that, where the alleged breach was a result of a *nonpayment of money*, for which full compensation could be made, 184 F. at 73, equity might preclude forfeiture in accordance with the terms of a contract.

In this case, Hennessy did not act in good faith in breaching the contract. The marking requirement that it violated was of sufficient importance to the parties to the contract that they provided that the breach of section 6 would allow the licensor to terminate the agreement. The court finds Hennessy's claim of reliance unpersuasive. It says it relied on the contract in making the Inflat-Air, but it now asks to be relieved, for this reason, of the known consequences of its subsequent—and continuing—refusal to acknowledge that the license applies to that device. The court does not find this position equitably compelling. Finally, the court notes that the result of its finding the contract to have been effectively terminated in 1974 will not be to render Hennessy's expenses in connection with the development of its inflation devices a waste of money, as B & J has offered to grant Hennessy a license to make the same devices it was previously licensed to make, albeit at the royalty rate that every other user of Corless' patents is now paying. For these reasons, even if the court had the equitable power to nullify paragraph 8 of the license agreement, it would not use that power in this case.

Accordingly, the court finds that the license agreement between B & J and Hennessy was properly terminated by B & J by the letter from its counsel to Hennessy dated September 16, 1974. Therefore, Hennessy's manufacture and sale of the accused devices, in any form, after its receipt of that letter, constituted unlicensed infringement of the patents in suit.

### REMEDY

This court having determined that Hennessy committed actionable infringement against the patents in suit by marketing the accused devices as kits and by making and marketing the same apparatus in any form after the termination of the license agree-

ment, it remains to consider the remedy to be allowed B & J.

*Damages*

B & J is entitled to an accounting to determine its actual damages under 35 U.S.C. § 284.[46]

 It also asks that, in accordance with that statute, its actual damages be trebled. However, in light of the fact that the court concludes that the infringement by Hennessy was not willful and that the issues regarding patent validity, license, and infringement were litigated in good faith, B & J's request for treble damages is denied. *Wahl v. Carrier Manufacturing Co.*, 511 F.2d 209 (7th Cir. 1975); *Union Carbide Corp. v. Graver Tank Mfg. Co.*, 282 F.2d 653 (7th Cir. 1960), *cert. denied*, 365 U.S. 812, 81 S.Ct. 692, 5 L.Ed.2d 691 (1961).

Hennessy's infringement of the patents in suit was not willful. The court finds that the question of whether the kits fall within the scope of the license grant was fairly debatable and was, in fact, litigated in good faith. The court further finds that the infringement resulting from B & J's termination of the license a year after the institution of these proceedings was not willful because, at that time, there existed fairly debatable issues of infringement (in light of the newly-conceived non-infringement/file wrapper estoppel defense) and the legal effect of B & J's purported terminations of the license, which issues were, with the exception of the question of the effectiveness of B & J's purported termination of the agreement in 1974, already being litigated in this court, and which were all ultimately litigated in good faith.

**46.** 35 U.S.C. § 284 provides:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

When the damages are not found by a jury, the court shall assess them. In either event

*Attorney's Fees*

These same considerations also cause the court to conclude that this is not an "exceptional case" within the meaning of 35 U.S.C. § 285.[47] *See Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 685 (7th Cir. 1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978). Therefore, B & J's petition for attorney's fees is denied.

*Costs*

As the prevailing party, B & J is entitled to an award of costs.

## CONCLUSION

Accordingly, the court holds that Hennessy has not proven the patents in suit invalid; that B & J has proven Hennessy to have committed unlicensed infringement of said patents by selling the accused devices as kits, and by making and selling them after its receipt of the letter from counsel for B & J dated September 16, 1974 in any form whatsoever; that B & J is entitled to an accounting to determine the amount of its damages; that B & J is entitled to an award of costs; that B & J is not entitled to an award of treble damages or attorney's fees; and that Hennessy is not entitled to an award of damages, costs, or attorney's fees. Therefore, final judgment is entered in favor of B & J on the liability questions found in the Amended Complaint and on the Counterclaim. This court retains jurisdiction herein solely for the purpose of conducting an accounting by Hennessy to B & J and, after the taking of said accounting, to enter a money judgment herein for and in favor of B & J against Hennessy in accordance with said accounting.

It is so ordered.

the court may increase the damages up to three times the amount found or assessed.

The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

**47.** 35 U.S.C. § 285 states that

[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party.